# Exhibit B

**INDIANA COMMERCIAL COURT**

| | |
|---|---|
| STATE OF INDIANA; STATE OF ALASKA; STATE OF FLORIDA; TERRITORY OF GUAM; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW HAMPSHIRE; STATE OF NEW MEXICO; STATE OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF VERMONT; and STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>EIDP, INC., formerly known as E.I. du Pont de Nemours and Co.; CORTEVA, INC.; and VYLOR, INC.,<br><br>Defendants. | In the Marion County Superior Court<br><br>Cause No. _____________<br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs the State of Indiana, State of Alaska, State of Florida, Territory of Guam, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of New Hampshire, State of New Mexico, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Tennessee, State of Texas, State of Vermont, and State of Washington (collectively, "Plaintiffs") bring this Complaint against Defendants EIDP, Inc., formerly known as E. I. du Pont de Nemours and Co. ("Old DuPont"), Corteva, Inc. ("Corteva"), and Vylor, Inc. ("Vylor") (collectively, "Defendants"), and allege as follows:

## I. INTRODUCTION

1. This fraudulent transfer action is necessitated by the decision of Old DuPont and its corporate parent, Corteva, to spin-off ***three-quarters*** of Old DuPont's asset value into Vylor, a

newly created entity, free and clear of Old DuPont's massive PFAS liabilities ("Vylor Spinoff"). In connection with the Spinoff, Vylor received the crown jewels of Old DuPont's business but did not assume any of its PFAS liabilities. As a result, the Spinoff placed most of Old DuPont's assets outside the reach of thousands of creditors like Plaintiffs, who seek to hold Old DuPont accountable for knowingly polluting the environment and poisoning almost all Americans with PFAS. The Spinoff also rendered Old DuPont insolvent, because its staggering PFAS liabilities far outstrip the value of the assets it retained. Because the Spinoff is fraudulent in design and effect, Plaintiffs ask this Court to require that Vylor's assets—which it obtained from Old DuPont through a fraudulent transfer—remain available to satisfy Plaintiffs' claims against Old DuPont.

2. Old DuPont traces its roots back to 1802. Beginning in the 1950s, Old DuPont transformed its chemicals business into a consumer products empire, becoming a household name with products such as Teflon® and Stainmaster® and growing into one of the largest companies in the world.

3. PFAS—short for per- and polyfluoroalkyl substances and often called "forever chemicals"—formed the backbone of many of Old DuPont's most profitable product lines, including Teflon®, Stainmaster®, and many others.

4. In its quest to turn a profit, Old DuPont polluted our nation's natural resources and drinking water supplies with PFAS in a variety of ways. Old DuPont spewed PFAS from its manufacturing sites. It accepted PFAS waste from other manufacturers and discharged that PFAS, too, into the environment. It provided PFAS-containing intermediate materials to industrial manufacturers in assorted industries, such as textile manufacturers, paper mills, semiconductors, and beyond, whose manufacturing processes further emitted PFAS into the environment. It sold products containing PFAS to be used in consumer products such as cookware, paper, food

wrappers, fabric and carpet, water-resistant shoes and clothing, cosmetics, ski wax, and more. And after those products exposed unsuspecting consumers to PFAS in their homes, the products were thrown out and sent to landfills, causing PFAS to seep from the landfills or be unwittingly sent to wastewater treatment facilities unprepared to treat for these chemicals. The list goes on and on.

5. Old DuPont knew the risks associated with PFAS by at least the 1960s, but it actively concealed those risks from its consumers, from the public, and from regulators around the world. Old DuPont knew that PFAS were toxic, persistent in the environment (hence "forever chemicals"), and accumulate in the blood of people exposed to PFAS. Despite that knowledge, Old DuPont continued to emit more and more PFAS from its manufacturing sites, produce more PFAS, and sell more PFAS and PFAS-containing products.

6. In the early 2000s, Old DuPont's history with PFAS became an existential threat. Internal documents uncovered in litigation brought by plaintiffs impacted by PFAS discharged from Old DuPont's Washington Works site in West Virginia revealed Old DuPont's dark past with PFAS. In the years that followed, claims for PFAS-related cancers and other health and environmental impacts brought by consumers, neighboring communities, and governmental entities grew exponentially.

7. Today, Old DuPont is a defendant in thousands of cases brought by states, municipal and local governments, private individuals, and other plaintiff groups. Collectively, these actions seek to require Old DuPont to clean up its pollution; seek damages for harm Old DuPont caused, including to natural resources; seek damages and civil penalties for Old DuPont's deceptive business practices; and seek to hold Old DuPont accountable for the adverse health impacts that its PFAS caused millions of Americans to suffer.

8. Facing this barrage of litigation, Old DuPont elected to transfer its most valuable assets to Vylor. As discussed *infra*, the Vylor Spinoff is far from Old DuPont's first restructuring intended to move assets away from the reach of its PFAS creditors. But the Vylor Spinoff is the first restructuring in which Old DuPont transferred assets to a newly formed entity that did not also accept responsibility for Old DuPont's historic PFAS liabilities. The entities involved in prior restructurings, including Corteva, agreed to assume all or a portion of Old DuPont's PFAS liabilities. What makes the Vylor transaction unique—and even more concerning—is that Old DuPont moved approximately $40 billion in asset value to Vylor, but Vylor has explicitly disclaimed any responsibility for Old DuPont's conduct related to PFAS. As a result, the assets that Old DuPont transferred to Vylor are no longer available to satisfy Old DuPont's massive PFAS liabilities, and are outside the reach of Old DuPont's creditors. Worse yet, Vylor only paid Old DuPont pennies on the dollar: Old DuPont received approximately $5 billion in value in the form of a distribution and debt exchange in exchange for assets worth $40 billion. And Old DuPont and Corteva are left unable to satisfy all of Old DuPont's PFAS and other liabilities—including its liabilities to Plaintiffs.

9. Plaintiffs are sixteen states and sovereign governments that have filed lawsuits against Old DuPont and Corteva in courts around the country asserting various statutory, environmental, consumer, product liability, and other tort claims arising out of Old DuPont's use and manufacture of PFAS. Plaintiffs' claims allege, among other things, that Old DuPont knew by the 1960s that PFAS and PFAS-containing products posed serious environmental and health risks, but it continued to manufacture, market, and sell those products and discharge PFAS into the environment while concealing or misrepresenting the risks of PFAS. While Old DuPont, Corteva, and related companies have made billions of dollars from selling PFAS products, PFAS

contamination has harmed Plaintiffs' residents, economic interests, and natural resources, including air, soil, sediment, biota, surface water, groundwater, other drinking water sources, wetlands, and state-owned properties within Plaintiffs' jurisdictions.

10. Plaintiffs are entitled to billions of dollars in past and future costs from Old DuPont, including the costs necessary: to investigate and remediate PFAS from thousands of impacted properties and public resources around the country; to test, treat, and/or replace public water resources, including surface waters, groundwater, and public and private drinking water wells; and to restore the public's natural resources to their pre-PFAS condition and/or to pay for the public's inability to use its public resources due to PFAS contamination. Old DuPont also must pay for the economic and consequential damages it caused the public, disgorge its ill-gotten profits, and pay civil penalties, punitive damages, fees, and other costs and damages arising from PFAS-related harm.

11. Plaintiffs came together to bring this action in Indiana—the locus of the Vylor Spinoff—to unwind the transaction and ensure that Vylor's assets are available to satisfy their claims. Following the Spinoff, Old DuPont, once a massive conglomerate, is now a shell of its former self. Its enormous liabilities accumulated over decades of knowingly contaminating America and the world with PFAS far exceed the value of its remaining assets, which now consist solely of a crop protection business. Old DuPont's and Corteva's spinoff of Vylor is exactly the type of fraudulent transaction that the Uniform Voidable Transfer Act is designed to prevent.

## II. THE PARTIES

12. Plaintiffs are the State of Indiana, State of Alaska, State of Florida, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of New Hampshire, State of New Mexico, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Tennessee, State of Texas, State of Vermont, State of Washington, and Territory of Guam.

13. Corteva is a Delaware corporation with its principal places of business located at 9330 Zionsville Road, Indianapolis, Indiana 46268.

14. Old DuPont is a Delaware corporation with its principal place of business located at 9330 Zionsville Road, Indianapolis, Indiana 46268. Old DuPont is a wholly owned subsidiary of Corteva.

15. Vylor was incorporated in Delaware on November 13, 2025, as "Seed External Spinco Inc." and its principal place of business was located at 9330 Zionsville Road, Indianapolis, Indiana 46268. On May 4, 2026, Seed External Spinco Inc. changed its name to "Vylor Inc." Upon information and belief, Vylor's principal place of business will be or has been relocated to 7000 NW 62nd Avenue, Johnston, Iowa 50131.

## III. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this civil action pursuant to I.C. § 33-29-1-1.5(1).

17. This Court has personal jurisdiction over Defendants because they maintain their corporate headquarters in Indiana (or in Vylor's case, did so for much of the conduct that gave rise to Plaintiffs' claims), regularly transact business in Indiana, maintain offices in Indiana, employ personnel in Indiana, own property in Indiana, and derive substantial revenue from business conducted in Indiana. Defendants also purposefully availed themselves of the privilege of conducting business in Indiana, and Plaintiffs' claims arise directly from Defendants' activities in Indiana, including the planning, implementation, authorization, ratification, and execution of the Vylor Spinoff. Vylor also entered into a transaction with and accepted all of its assets from an Indiana-based entity.

18. Venue is proper in Marion County pursuant to Indiana Rule of Trial Procedure 75(A)(1) and (4) because the residence and principal offices of Corteva and Old DuPont are located in Marion County.

## IV. PFAS

19. PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellent. PFAS are entirely humanmade and do not occur in nature.

20. PFAS enter the environment from industrial facilities that manufacture or use PFAS. Releases to land, air, and water from a multitude of industrial sites are known pathways to the environment. PFAS also enter the environment when released from PFAS-containing consumer and commercial products during their use and disposal.

21. PFAS have characteristics that cause extensive and persistent environmental contamination. PFAS are mobile in that they are soluble and do not adsorb (stick) to soil particles, and they can be transported through surface water and the soil and can also migrate through groundwater. And PFAS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are discharged, emitted, or otherwise released onto land or into the air or water, those compounds can migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

22. PFAS bioaccumulate (buildup in living organisms), biopersist (remain inside a living organism or the environment rather than being broken down, metabolized, or expelled), and biomagnify (concentration in living organisms increases as you move up the food chain) in people

and other organisms. Nearly all people in the United States have measurable amounts of PFAS in their blood.

23. Perfluorooctanoic acid ("PFOA") is one of the most widely studied PFAS, and it has been shown to be toxic at very low concentrations. Exposure to PFOA in both humans and animals has been linked to several diseases, including kidney and testicular cancers, thyroid disease, ulcerative colitis, high cholesterol, pregnancy-induced hypertension (including preeclampsia), and low birth weight. Exposure to PFOA has also been linked to various birth defects.

24. PFAS contamination presents a serious threat to public health through drinking water. Humans can also be exposed through contaminated food, inhalation, and dermal contact.

25. Because of the threat posed by PFAS, the federal government and state governments across the country have adopted regulations establishing maximum contaminant levels ("MCLs," which are drinking water standards) and specific groundwater criteria for several PFAS, including PFOA. Several states have also added several PFAS, including PFOA, to their lists of regulated substances under their environmental-discharge statutes.

26. In 2024, the United States Environmental Protection Agency ("US EPA") issued Safe Drinking Water Act regulations, which, among other things, set MCLs for certain PFAS, including 4 parts per trillion ("ppt") for PFOA. The Trump Administration subsequently ratified the risk-determinations and federal regulations now applicable to PFOA in every state.

## V. OLD DUPONT USED AND RELEASED PFAS FOR DECADES WITH KNOWLEDGE OF ITS DANGERS

27. Old DuPont started purchasing PFOA from the 3M Company in the 1950s for use in the manufacturing process for its name-brand product Teflon, commonly known for its use as a coating for non-stick cookware. Old DuPont sold PFAS and PFAS products to downstream

manufacturers for use in consumer and industrial end products. Old DuPont also manufactured name-brand products of its own containing PFAS, such as Stainmaster and Zonyl.

28. Old DuPont learned that PFAS was harmful shortly after it started using them. Nevertheless, in the decades that followed, Old DuPont manufactured, produced, or used PFOA and other PFAS at industrial sites across the United States, including major sites in New Jersey (Chambers Works and Parlin), West Virginia (Washington Works), and North Carolina (Fayetteville Works). Old DuPont also used PFAS at its major manufacturing sites overseas, including in the Netherlands and Japan.

29. PFAS are mostly unaffected by any of the manufacturing processes in which they are used. As a result, Old DuPont's PFAS ended up in the wastewater generated during the manufacturing process, were emitted directly into the air, ended up as part of Old DuPont's products, or ended up as part of the products of industrial and retail customers of Old DuPont that used its PFAS or PFAS products.

30. 3M phased out production of PFOA in 2002 because of environmental and public health concerns. Undeterred, Old DuPont decided to double down. Old DuPont began producing its own PFAS and continued to use it for years.

31. In connection with various manufacturing processes, Old DuPont discharged and emitted PFOA and other PFAS in large quantities into the environment. At times, those discharges and emissions totaled tens or hundreds of thousands of pounds of PFAS per year.

32. Those discharges and emissions exposed millions of people to PFOA and other PFAS, including through public and private drinking water supplies.

33. As all of this was going on, Old DuPont knew that PFAS are harmful to human health and the environment.

34. As early as 1961, Old DuPont's in-house scientists issued internal warnings about the toxicity associated with PFOA, indicating that PFOA caused adverse liver reactions in rats and dogs. And an Old DuPont toxicologist opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

35. In the decades that followed, Old DuPont made disturbing discovery after disturbing discovery—yet it disclosed nothing. Old DuPont knew that PFOA released from its sites had contaminated drinking water and bodies of water from which drinking water is drawn. It knew that PFOA was in the blood of the general public. It knew that PFOA exposure was associated with a higher incidence of health problems in exposed persons. It knew that PFOA can travel from pregnant mothers to their babies. And it knew that PFOA accumulates in human blood.

36. In internal documents, Old DuPont employees referred to PFOA as "the devil we know" and feared that "toxicity issues" associated with PFOA "could turn it into the #1 DuPont torte [*sic*] issue."

37. Nevertheless, Old DuPont elected to prioritize its profits over human health and the environment. In 1984, after obtaining data on the PFOA releases and resulting contamination near its Washington Works manufacturing facility, Old DuPont employees met to discuss health and environmental issues related to PFOA.

38. During that meeting, Old DuPont employees spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

39. Old DuPont chose not to implement available remedial technologies or replacement materials for PFOA and continued to release an increasing amount of PFOA into the environment from its operations and through its products across the country.

40. Old DuPont also placed PFAS directly into the stream of commerce. For decades, Old DuPont manufactured and sold a wide array of products containing PFOA and other PFAS to be used in consumer end products, such as products used in cookware, carpeting, upholstery, cosmetics, and food packaging. Old DuPont sold its PFAS-containing products under well-known brand names including: (i) Teflon, used as a non-stick coating for cookware, a protector for carpets, a coating for waterproof clothing, a cover for ironing boards, and many other purposes; (ii) Stainmaster, used as a soil and stain repellent for carpets and fabrics; and (iii) Zonyl, used as an alternative to wax-paper food packaging.

41. Old DuPont marketed its PFAS-containing consumer products as having remarkable benefits such as resistance to heat, oil, stains, grease, and water. Images in advertisements showed the integration of Old DuPont's products into the life of the American family—including images of mothers cooking on non-stick cookware and of babies crawling on stain resistant carpets.

42. Old DuPont promoted the value and safety of its PFAS-containing products to the American public, but failed to disclose the associated risks. In the 1980s, advertisements directed toward mothers conveyed that Teflon and Stainmaster would protect carpets from messes caused by babies and toddlers. Yet at the same time, Old DuPont had determined internally that PFOA, which is used to make these products, is toxic, bioaccumulates, and biopersists in humans.

43. The permeation of the market with consumer products containing Old DuPont's PFAS exposed unsuspecting consumers to PFAS in a variety of ways, including ingestion, inhalation, and dermal absorption.

44. Old DuPont knew that PFAS were being released from consumer products, exposing consumers. For example, by 2003, Old DuPont knew that carpeting treated with its PFAS products contained PFOA concentrations higher than Old DuPont internally had determined were "acceptable" and that infants were absorbing PFOA into their bodies on a daily basis from lying on Old DuPont's Stainmaster carpets. Old DuPont knew that PFAS from its consumer products were entering the blood of all Americans at levels that posed risks to human health, and yet Old DuPont spent millions on an aggressive (and award-winning) marketing campaign to entice all Americans to buy their products and put PFAS-treated carpets, textiles, paper products, and pans into their homes. Yet Old DuPont continued to market its PFAS-containing products as safe for consumer use and concealed the risk of harm from the public.

45. Old DuPont's infection of consumer products with PFAS also magnified the environmental harm Old DuPont caused. Its sale of PFAS and PFAS-containing products to third-party manufacturers resulted in additional releases of PFAS into the environment through third-party manufacturing discharges, product degradation, and ultimate disposal of products.

## VI. <u>THE PROLIFERATION OF PFAS LITIGATION AGAINST OLD DUPONT</u>

46. In the late 1990s, the wave of PFAS-related litigation that Old DuPont anticipated decades earlier began.

47. In 1999, Wilbur Tennant—a farmer who owned a farm near Washington Works—sued Old DuPont. Mr. Tennant noticed that a creek on his farm, which ran adjacent to an Old DuPont landfill that accepted waste from Washington Works, was foaming and turning an unnatural color. Mr. Tennant's cattle—which drank from the creek—also began exhibiting bizarre symptoms, including tumors, stillbirths, and black teeth, eventually leading to the loss of nearly his entire herd. The Tennant family sued Old DuPont, alleging that its operations at Washington

Works had contaminated the creek. Discovery in that case uncovered internal corporate documents revealing that Old DuPont had known for decades that PFAS are harmful to human health and the environment, yet it continued to emit substantial quantities of PFAS from the site.

48. Old DuPont also knew that it had emitted substantial PFAS from other major U.S. manufacturing sites. Its in-house lawyers were very concerned that Old DuPont's conduct and non-disclosure practices exposed it to substantial, foreseeable liability.

49. In October 2000, one of Old DuPont's in-house lawyers dealing with the *Tennant* case recognized that Old DuPont had a problem, and a big one at that. He wrote: "The sh[]t is about to hit the fan in WV, the lawyer for the farmer finally realizes the surfactant issue, he is threatening to go to the press to embarrass us to pressure us to settle for big bucks. . . . Finally the plant recognized it must get public first, something I have been urging for over a year, better late than never."

50. Later, that same in-house lawyer referred to Old DuPont's handling of the risks associated with its use of PFOA as "[a] debacle at best." He added: "the business did not want to deal with issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

51. In November 2000, another one of Old DuPont's in-house lawyers handling PFOA issues wrote his in-house colleague: "the biopersistence issue will kill us." He continued: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical

into the community and the environment because of our concern about the biopersistence of this chemical."

52. The *Tennant* lawsuit settled confidentially, and Mr. Tennant and his wife both died after being diagnosed with cancer a few years later.

53. In 2001, a class action was filed on behalf of some 80,000 residents of West Virginia and Ohio styled *Leach v. E.I. du Pont de Nemours & Co.* The plaintiffs sought various forms of relief for Old DuPont's contamination of their drinking water sources.

54. In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act and the Resource Conservation and Recovery Act. Old DuPont settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."[1]

55. In 2005, Old DuPont agreed to settle the *Leach* class action for $343 million. Pursuant to the terms of the settlement, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to independently confirm which diseases were linked to PFOA exposure, to filter local water for PFOA, and to set aside up to $235 million for medical monitoring of the affected community for diseases linked to PFOA exposure. The settlement also provided that any class members who developed the linked diseases would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that their exposure to PFOA could cause those diseases.

1 *See* https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental.

56. By 2013, the Science Panel had confirmed several human diseases with "probable links" to PFOA exposure, including kidney cancer, testicular cancer, ulcerative colitis, pregnancy-induced hypertension (including preeclampsia), thyroid disease, and high cholesterol.

57. Following the Science Panel's conclusions, more than 3,500 individual personal injury claims were filed against Old DuPont in Ohio and West Virginia consistent with the terms of the 2005 settlement. These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "Ohio MDL").

58. Six "bellwether" trials were scheduled to take place in 2015 and 2016 involving plaintiffs who suffered from various forms of cancer. Old DuPont lost each trial with juries awarding millions of dollars in compensatory and punitive damages.

59. In February 2017, Old DuPont settled many of the remaining claims brought in the Ohio MDL for $670.7 million.

60. Following that settlement, additional plaintiffs filed claims against Old DuPont that were transferred to the Ohio MDL. In 2020, a jury awarded $40 million to one such plaintiff who suffered from testicular cancer.

61. Two more settlements were subsequently reached in the Ohio MDL: (1) an $83 million settlement of approximately 100 claims in 2021; and (2) a $59 million settlement of all remaining cases in the Ohio MDL in 2024.

## VII. OLD DUPONT'S SPINOFF OF CHEMOURS

62. Old DuPont knew that it faced continuing and mounting exposure relating to its use of PFOA and other PFAS and that its liability would easily reach into the billions of dollars.

63. In 2013, while the bellwether trials in the Ohio MDL were being scheduled, Old DuPont's management began to consider restructuring the company in an attempt to avoid responsibility for the widespread harm caused by Old DuPont's use and manufacture of PFAS. Old DuPont referred to this initiative internally as "Project Beta."

64. Through Project Beta, Old DuPont set out to isolate its business lines associated with the use and manufacture of PFAS into a new wholly owned subsidiary and spin the new company off as an independent public entity—The Chemours Company ("Chemours")—saddled with Old DuPont's massive legacy PFAS liabilities.

65. Project Beta focused on Old DuPont's "performance chemicals" segment, which is the source of its PFAS liabilities. The performance chemicals segment included Old DuPont's business lines that had manufactured and used PFAS for a variety of products and had discharged PFAS into the environment.

66. Old DuPont carried out Project Beta in 2014 and 2015, with a goal of completing the spinoff before any of the Ohio MDL bellwether cases were tried. It formed Chemours as a wholly owned subsidiary in or about February 2014. Continuing into 2015, Old DuPont carried out an internal reorganization that transferred to Chemours all assets related to the performance chemicals business, including Washington Works, Fayetteville Works, Chambers Works, and dozens of other chemical plants.

67. On July 1, 2015, just months before the first trial in the Ohio MDL was scheduled to begin, Old DuPont completed the spinoff of its performance chemicals business, and Chemours became a separate, publicly traded entity.

68. To effectuate the Chemours spin, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement"). Pursuant to the Chemours

Separation Agreement, Chemours assumed Old DuPont's massive liabilities relating to the performance chemicals business, including those arising from Old DuPont's historical use and manufacture of PFAS.

69. The Chemours Separation Agreement also required Chemours to indemnify Old DuPont against its historic PFAS liabilities. Under the Agreement, Chemours's indemnification obligations are uncapped and continue indefinitely.

70. Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, Old DuPont also required Chemours to pay a dividend to Old DuPont in the approximate amount of $4 billion.

71. Chemours was so undercapitalized at the time of the spinoff, and its liabilities were so large, that market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

72. After the Chemours spinoff, Old DuPont took the position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the performance chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

73. But of course, Old DuPont could not contractually pardon itself of its own historical liabilities through the Chemours spinoff, and Old DuPont remained directly liable for the widespread harm that it had caused. Indeed, more recently, Old DuPont took the position that the Chemours spinoff cannot form the basis of a fraudulent transfer claim precisely because Old DuPont retained its PFAS liabilities following the transaction—and thus remains a judgment debtor on those claims.

## VIII. OLD DUPONT'S CREATION OF NEW DUPONT AND CORTEVA

74. Notwithstanding its initial public position following the Chemours spinoff that PFAS creditors must look to Chemours, Old DuPont knew that it still faced direct liability for its own conduct. Accordingly, Old DuPont attempted to further distance itself from its PFAS liabilities through further restructurings.

75. On December 11, 2015, Old DuPont and the Dow Chemical Company ("Old Dow") announced that the two companies would "combine" into a newly formed company, DowDuPont, Inc. ("DowDuPont"). Through a so-called "merger of equals," Old DuPont and Old Dow each became subsidiaries of DowDuPont.

76. Now holding Old DuPont and Old Dow, DowDuPont reorganized the assets of the two companies into three divisions: (i) the agriculture business, (ii) the specialty-products business, and (iii) the materials-science business.

77. DowDuPont then incorporated two new companies to hold two of the newly formed business lines: (i) Corteva, which became the parent company of Old DuPont, which in turn held the agriculture business, and (ii) Dow, Inc. ("New Dow"), which became the parent company of Old Dow, which in turn held the materials-science business. DowDuPont retained the specialty-products business.

78. In 2019, DowDuPont spun off the two new entities—Corteva and New Dow—as independent, publicly traded companies.

79. The below graphic depicts the DowDuPont restructuring as it progressed through each of the three steps:




80. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont spun off New Dow.

81. On or about May 2, 2019, DowDuPont consolidated the agricultural business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva.

82. The separation of Corteva was completed on or about June 1, 2019, when DowDuPont spun off Corteva (and with it, Old DuPont). DowDuPont then changed its name to DuPont de Nemours, Inc. (i.e., "New DuPont").

83. As a result of these transactions, the company responsible for widespread PFAS contamination, Old DuPont, is hidden as a subsidiary of Corteva. Meanwhile, the company that publicly bears the "DuPont" name, New DuPont, disclaims any relation to PFAS.

84. Importantly, however—and in stark contrast to the Vylor Spinoff—New DuPont and Corteva contractually assumed Old DuPont's PFAS liabilities as part of the DowDuPont restructuring.

85. The allocation of liabilities in the DowDuPont restructuring is governed by an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

86. On June 1, 2019—after New Dow had been spun off from New DuPont—Corteva and New DuPont entered into a letter agreement that amended certain terms and schedules of the DowDuPont Separation Agreement ("Letter Agreement").

87. Under the Letter Agreement, New DuPont and Corteva contractually assumed Old DuPont's historic liabilities related to the Performance Chemicals business that Old DuPont spun-off to Chemours (*i.e.*, Old DuPont's PFAS liabilities). New DuPont assumed 71% of the liabilities and Corteva assumed the remaining 29%—such that, together, they are 100% liable.

88. A press release issued by Corteva and New DuPont confirms that: "Under the existing Letter Agreement from June 1, 2019, [New] DuPont and Corteva will each bear 50 percent of the first $300 million (up to $150 million each) and thereafter, [New] DuPont bears 71 percent and Corteva bears the remaining 29 percent."[2]

89. In 2022, in a lawsuit filed by the State of North Carolina against Old DuPont, Chemours, Corteva, and New DuPont, the Supreme Court of North Carolina affirmed the trial

[2] Based on New DuPont's and Corteva's public filings, the $300 million has been satisfied.

court's determination that Corteva and New DuPont assumed Old DuPont's PFAS liability. The court held that "the Business Court's interpretation of the plain language of the Agreements is well supported, and we uphold its finding that Corteva and New DuPont expressly assumed Old DuPont's PFAS liabilities[.]" *State ex rel. Stein v. E. I. du Pont de Nemours and Co.*, 382 N.C. 549, 563 (2022).

90. Thus, as a result of the Letter Agreement, Corteva and New DuPont are directly liable for Old DuPont's PFAS liabilities in accordance with the percentages set forth in the DowDuPont Separation Agreement.

## IX. <u>CHEMOURS SUED OLD DUPONT AND ASSERTED THAT THE CHEMOURS SPINOFF WAS UNLAWFUL</u>

91. In 2019, Chemours sued Old DuPont, Corteva, and New DuPont in Delaware state court based on the terms of the Chemours spinoff ("Delaware Action").

92. Chemours alleged that Old DuPont's board had determined that Chemours would be solvent based on purported "High End (Maximum) Realistic Exposure" numbers that Old DuPont certified for each of the many contingent liabilities it dumped on Chemours. Chemours alleged that these so-called "maximum" numbers that Old DuPont used "systematically and spectacularly underestimated its actual exposure." According to Chemours, "[b]y lowballing the valuation of the liabilities, DuPont's management could heap more liabilities on Chemours and withdraw more cash for DuPont—while still calling the spin-off appropriate and Chemours solvent."

93. Notwithstanding that Old DuPont's board approved the Chemours spin based on the certified maximum liability estimates, Chemours alleged that post-spin, Old DuPont demanded uncapped indemnity from Chemours for all claims arising out of those legacy liabilities regardless of whether they exceeded the estimates on which the spinoff was based.

94. Chemours admitted that if it had unlimited responsibility for Old DuPont's legacy environmental liabilities, as Old DuPont claimed, Chemours would have been insolvent as of the time of the spinoff.

95. On January 22, 2021, Chemours settled its claims in the Delaware Action. The parties agreed to share responsibility for certain future PFAS liabilities up to $4 billion. New DuPont and Corteva agreed to contribute $2 billion, collectively, toward the next $4 billion in PFAS liabilities that Chemours assumed from Old DuPont and Chemours would contribute the other $2 billion. Of the $2 billion that Corteva and New DuPont agreed to contribute, Corteva was responsible for 29% and New DuPont was responsible for 71%, consistent with the allocation of liabilities between those entities under the Letter Agreement.[3] That $4 billion cost-sharing agreement is nearing exhaustion, which will leave Chemours exposed to costs it cannot absorb.

## X. <u>THE PFAS LITIGATION CONTINUES</u>

96. PFAS litigation continued to mushroom amidst Old DuPont's corporate restructurings. States and territories across the country began suing Old DuPont (and Chemours, Corteva, and New DuPont) seeking, among other things, environmental remediation and restoration of contaminated lands, damages for harm to their natural resources, and damages and penalties for deceiving customers.

97. In 2018, the State of Ohio sued Old DuPont, Chemours, Corteva, and New DuPont seeking compensation for damages to its natural resources related to PFOA releases from Washington Works (*i.e.*, for PFAS blowing over the Ohio River and into Ohio). In 2023, that case settled, and the defendants agreed to pay $110 million to restore Ohio's natural resources across

[3] See Memorandum of Understanding between The Chemours Co., Corteva, Inc., E.I. du Pont de Nemours & Co., and DuPont de Nemours, Inc., available at https://sec.report/Document/0001193125-21-014180/d108516dex101.htm.

the state. The defendants also agreed to monitor, test, and, if necessary, treat PFOA in drinking water found at least 25 miles from the facility.

98. In 2019, the State of New Jersey commenced four actions against Old DuPont, Chemours, New DuPont, and Corteva relating to four facilities that Old DuPont operated in the State, including Chambers Works. New Jersey's complaints sought to hold Old DuPont liable for PFAS and other contamination from the facilities, including by requiring it to fund and perform investigation, cleanup, remediation, and restoration. The complaint also sought natural resources damages, statutory penalties, and punitive damages.

99. In 2025, the New Jersey litigation settled. Old DuPont and the other DuPont entities agreed to remediate the four sites (and other sites owned or operated by Old DuPont) to the satisfaction of the State. While the defendants agreed to establish financial assurance mechanisms to fund the cleanups, which could total as much as $1.2 billion, Old DuPont's responsibility and liability for the remediation of contamination from its sites in New Jersey is absolute and uncapped. In addition, Old DuPont, Chemours, Corteva, and New DuPont agreed to pay the State $875 million for PFAS abatement costs and natural resource damages across the State. The New Jersey Judicial Consent Order was entered on August 7, 2026.

100. In 2020, the State of North Carolina sued Old DuPont, Chemours, Corteva, and New DuPont seeking compensation for natural resource damage and property damage related to PFOA and other PFAS releases from the Fayetteville Works site. North Carolina also sought a judgment requiring Old DuPont and the other defendants to pay all past and future costs associated with the state's efforts to investigate and remediate the PFAS contamination caused by Old DuPont's operations at Fayetteville Works.

101. The North Carolina litigation settled in 2026—weeks before the Vylor Spinoff. Old DuPont and the other entities agreed to pay $455 million to restore North Carolina's natural resources and help ensure clean drinking water across the state, representing the largest environmental settlement secured in North Carolina to date. In addition, the North Carolina settlement established a $135 million reserve fund for completion of remediation obligations for Fayetteville Works pursuant to a 2019 consent order.

102. Old DuPont is defending lawsuits brought by many other states and sovereigns—including Plaintiffs.

103. **Indiana**: In 2024, the State of Indiana brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by aqueous film-forming foams ("AFFF") and consumer products that were manufactured and marketed by the DuPont entities and other defendants as well as from industrial sources. The case is pending in the AFFF Multidistrict Litigation in the U.S. District Court for the District of South Carolina ("AFFF MDL").

104. **Alaska**: In 2021, the State of Alaska brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF and consumer and industrial products that were manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

105. **Florida**: In 2022, the State of Florida brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that

was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

106. **Maine**: In 2023, the State of Maine brought two lawsuits against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. One case seeks damages and other relief for contamination caused by the DuPont entities' non-AFFF consumer and industrial products. The other case seeks damages and other relief for PFAS contamination caused by AFFF. Both cases are pending in the AFFF MDL.

107. **Maryland**: In 2023, the State of Maryland brought two lawsuits against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. One case seeks damages and other relief for contamination caused by the DuPont entities' non-AFFF consumer and commercial products. The other case seeks damages and other relief for PFAS contamination caused by AFFF. Both cases are pending in the AFFF MDL.

108. **Massachusetts**: In 2022, the Commonwealth of Massachusetts brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

109. **New Hampshire**: In 2019, the State of New Hampshire brought two lawsuits against PFAS and PFAS-product manufacturers. Both lawsuits now include claims against Old DuPont, Chemours, Corteva, and New DuPont. One case seeks damages and other relief for contamination caused by the DuPont entities' non-AFFF consumer and industrial products. The other case seeks damages and other relief for PFAS contamination caused by AFFF. The non-AFFF case is pending

in the Merrimack County Superior Court of New Hampshire. The AFFF case is pending in the AFFF MDL.

110. **New Mexico**: In 2023, the State of New Mexico brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

111. **Oregon**: In 2023, the State of Oregon brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

112. **Pennsylvania**: In 2023, the Commonwealth of Pennsylvania brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities. The case is pending in the AFFF MDL.

113. **Rhode Island**: In 2023, the State of Rhode Island brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF and other consumer and industrial products that were manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

114. **Tennessee**: In 2023, the State of Tennessee brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

115. **Texas**: In 2023, the State of Texas brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL. In 2024, Texas filed a separate consumer protection suit in Johnson County District Court against defendants including Corteva, New DuPont, and Old DuPont, alleging the companies misrepresented the safety of consumer products containing PFAS. After the defendants removed it, the consumer protection case was remanded to the state court.

116. **Vermont**: The State of Vermont has two lawsuits pending against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont based on their use and manufacture of PFAS. One case, which is pending in Vermont federal court and has completed discovery, seeks damages and other relief for contamination of Vermont's natural resources at numerous locations throughout the state caused by non-AFFF consumer and industrial products. The other case, which is pending in the AFFF MDL, seeks damages and other relief for PFAS contamination caused by AFFF.

117. **Washington**: In 2023, the State of Washington brought a lawsuit against PFAS and PFAS-product manufacturers and their successors, including Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF

that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

118. **Guam**: In 2019, Guam brought a lawsuit against PFAS and PFAS-product manufacturers and their successors that now includes Old DuPont, Chemours, Corteva, and New DuPont. The case seeks damages and other relief for PFAS contamination caused by AFFF that was manufactured and marketed by the DuPont entities and other defendants. The case is pending in the AFFF MDL.

119. Apart from the state-initiated actions, Old DuPont (along with Chemours and Corteva) agreed to a $1.185 billion settlement to resolve drinking-water claims brought by a class of U.S. public water systems. Those claims all were part of the AFFF MDL, although the claims were not limited to contamination caused by AFFF. The AFFF MDL court approved the public water systems settlement in 2024, but many more claims remain pending against Old DuPont and related entities in the AFFF MDL.

120. Old DuPont also continues to face thousands of personal injury and property damage claims across the country by plaintiffs who assert to have developed diseases from PFAS exposure or whose property value has been impacted by PFAS contamination.

121. Most recently, in August 2026, a multidistrict litigation against Old DuPont and other defendants was centralized in the District of Minnesota to host claims for harm caused by PFAS in personal protective equipment for firefighters.

## XI. OLD DUPONT SEEKS TO SHIELD BILLIONS OF DOLLARS WORTH OF ASSETS THROUGH THE VYLOR SPINOFF

122. On October 1, 2025, just months after Old DuPont's record-breaking New Jersey settlement, Corteva announced that it would separate the vast majority of Old DuPont's asset

value—which resided in its lucrative seeds business—by spinning that business off to Corteva's shareholders through yet another new independent company, Vylor.

123. The Vylor Spinoff is a transparent attempt by Old DuPont and Corteva to separate billions of dollars in assets from the massive liabilities that Old DuPont continues to face. Indeed, unlike the previous restructuring transactions that Old DuPont carried out, this time, the newly created independent company that received Old DuPont's assets (Vylor), contractually assumed ***none*** of Old DuPont's PFAS liabilities. The transaction left Old DuPont insolvent and unable to satisfy the tens (or hundreds) of billions of dollars in PFAS liabilities that it continues to face with the meager assets it retained.

124. Before the Vylor Spinoff, Corteva and Old DuPont operated through two principal business lines: a seeds business and a crop protection business. All of Corteva's operating assets related to both businesses resided within Old DuPont. The seeds business and crop protection business were all that was left of Old DuPont after all of the aforementioned restructurings and divestitures—and the seeds business is much more valuable than the crop protection business.

125. Pioneer Hi-Bred International, Inc. ("Pioneer")—now a former subsidiary of Old DuPont—was Corteva's flagship seeds brand and the entity through which Corteva and Old DuPont developed, produced, and sold genetically modified and hybrid seeds. Pioneer sells seeds in more than 80 countries and holds approximately 40% of the North American corn seed market. The Pioneer brand is the number one planted corn and soybean brand in the United States. The spun-off seeds business also includes a new brand, Brevant, that Corteva launched shortly before the Vylor spinoff and other regional seeds brands.

126. The seeds business generates twice the profits and has higher projected future growth than the crop protection business. As a going concern, the seeds business assets that Old DuPont

just transferred to Vylor (and away from Old DuPont's PFAS liabilities) are worth approximately $40 billion. The crop protection business assets that Old DuPont retained are worth approximately $14 billion. The Vylor Spinoff thus resulted in a 75/25 asset value split in favor of Vylor.

127. When Corteva announced the spinoff of Old DuPont's seeds business, it also announced that its CEO Chuck Magro (who was based out of Corteva's Indianapolis headquarters) would leave Corteva to become the CEO of the new company (i.e., Vylor). The fact that Corteva's CEO was joining the newly formed entity signaled to stock analysts that Vylor would be the "prioritized business." The analysts' predictions proved accurate, as Vylor received the majority of Old DuPont and Corteva's assets in exchange for just a small fraction of their value and assumed ***none*** of Old DuPont's PFAS liabilities.

128. Corteva incorporated Vylor on November 13, 2025 as "Seed External Spinco Inc.," and on May 4, 2026, changed its name to Vylor, Inc. As of its incorporation, Vylor was a subsidiary of Corteva—and thus a sister subsidiary in relation to Old DuPont.

129. To carry out the Vylor Spinoff, Corteva undertook an internal reorganization to consolidate the seeds business under Pioneer, an Old DuPont subsidiary. Old DuPont then contributed all of its interest in Pioneer to Vylor. Once this step was complete, Vylor was a subsidiary of Old DuPont. However, Old DuPont then distributed all of Vylor's common stock upward to Corteva, such that Old DuPont and Vylor once again were sister subsidiaries of Corteva. Except now, it was Vylor and not Old DuPont that held the seeds business. Yet, Old DuPont retained all of the PFAS liabilities.

130. In exchange for the seeds business that it transferred to Vylor, Old DuPont received aggregate consideration of approximately $5 billion, consisting of cash or distributions and a debt exchange.

131. The Vylor Spinoff was completed on October 1, 2026. Corteva distributed all of Vylor's common stock to Corteva's shareholders such that Corteva's shareholders became the initial shareholders of Vylor and Vylor became an independent publicly traded company. Vylor trades on the New York Stock Exchange under the ticker symbol VYLR.

132. This transaction effectuated a massive transfer of wealth away from Old DuPont and to Corteva's shareholders at the expense of creditors, such as Plaintiffs, who face significant risk of being left without redress for the substantial harm Old DuPont has caused them.

133. Corteva's executives who jumped ship for Vylor stressed before the Vylor Spinoff that the allocation of liabilities was a central feature of the transaction. Corteva's then-CFO, who is now with Vylor, stated during a May 6, 2026, earnings call, that one of the "major considerations" in connection with the Vylor Spinoff was "where the liabilities sit," and that "liabilities will stay with the company that they are in today," i.e., Old DuPont. RBC Capital Markets reported that Corteva's "[m]anagement confirmed that PFAS-related liabilities remain within the Corteva structure" and that "[s]eeds will not have to bear any PFAS liability."

134. Indeed, Vylor's CFO stated that "the DuPont pension and PFAS" obligations would "remain in [] Corteva in the future." Corteva's former CEO (also now with Vylor) likewise stated that the crop protection and pesticides obligations then held by Corteva would remain with Corteva, "including the historical DuPont pension and PFAS liabilities."

135. The purpose and effect of the Vylor Spinoff was to remove a business worth more than $40 billion as a going concern from the direct reach of Old DuPont's creditors, including Plaintiffs, in exchange for a cash distribution worth a small fraction of that amount, while leaving Old DuPont and Corteva with direct responsibility for Old DuPont's legacy liabilities and no means to satisfy them.

136. Market analysts have uniformly recognized that Vylor was the clear winner in the transaction, describing it as receiving "premium assets, superior margins, and ***complete liability avoidance***" and a "high-return, faster-growth business" unburdened by Old DuPont's legacy costs and liabilities.

137. Old DuPont's legacy PFAS and other environmental liabilities are substantial and include costs associated with remediating PFAS-contaminated sites, treating certain public and private drinking water wells contaminated with PFAS, defending and resolving PFAS personal-injury and property damage claims, satisfying state economic and natural resource damages claims, and satisfying state consumer-protection claims for damages and civil penalties.

138. The Vylor Spinoff rendered Old DuPont and Corteva insolvent and unable to satisfy Old DuPont's legacy PFAS and other environmental liabilities. As a result, Plaintiffs are at risk of having no ability to recover on any judgment they obtain against Old DuPont and ultimately bearing the costs of Old DuPont's misconduct.

139. The going concern value of the crop protection business that Old DuPont and Corteva retained is approximately $14 billion. Yet Old DuPont's PFAS liabilities at a minimum are well into the tens of billions of dollars. Old DuPont also has funding debt and more than $800 million in liabilities under its U.S. pension plan and other post-employment benefits. Old DuPont and Corteva's debts and contingent liabilities therefore far exceed the value of their remaining assets.

140. Old DuPont and Corteva did not receive reasonably equivalent value in exchange for the assets transferred and obligations incurred in connection with the Vylor Spinoff.

141. Furthermore, the capital remaining in Old DuPont and Corteva is unreasonably small for the business in which they are engaged.

142. Vylor itself acknowledged that the Vylor Spinoff carried fraudulent transfer risk. Vylor disclosed to investors that "the spin-off, including certain internal reorganization transactions undertaken by Corteva in connection therewith, may expose us to potential liabilities arising out of state and federal fraudulent conveyance laws and legal distribution requirements."

**COUNT I.**
**ACTUAL FRAUDULENT TRANSFER - UVTA**
**(AGAINST ALL DEFENDANTS)**

143. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

144. Plaintiffs are, and at all relevant times were, creditors of Old DuPont and Corteva.

145. Through their participation in the Vylor Spinoff, Old DuPont and Corteva sold or transferred, directly or indirectly, valuable assets and business lines to Vylor and, as part of the same Vylor Spinoff, Old DuPont distributed all of its shares in Vylor to Corteva and Corteva then distributed all Vylor common stock to the holders of record of Corteva common stock (the "Vylor Transfers").

146. Corteva and Old DuPont made the Vylor Transfers with the actual intent to hinder, delay, or defraud existing and future creditors, including Plaintiffs.

147. Plaintiffs have been harmed as a result of the Vylor Transfers.

148. Old DuPont, Corteva, and Vylor engaged in acts in furtherance of a scheme to transfer assets out of the reach of parties such as the Plaintiffs that have been damaged as a result of the actions described in this Complaint.

149. Under I.C § 32-18-2-1 et seq., Plaintiffs are entitled to void the Vylor Transfers to the extent necessary to satisfy Plaintiffs' claims, recover property or value transferred to Vylor, enjoin Vylor, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont transferred to it, enjoin Old DuPont and Corteva from further

disposition of their assets, and impose a constructive trust over such property or value for the benefit of Plaintiffs.

**COUNT II.**
**CONSTRUCTIVE FRAUDULENT TRANSFER – UVTA**
**(AGAINST ALL DEFENDANTS)**

150. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

151. Plaintiffs are and were creditors of Old DuPont and Corteva at all relevant times.

152. Old DuPont and Corteva did not receive reasonably equivalent value in exchange for the Vylor Transfers.

153. The Vylor Transfers were made to or for the benefit of Vylor and Corteva's shareholders.

154. Old DuPont and Corteva made the Vylor Transfers when they were engaged or about to be engaged in a business for which their remaining assets were unreasonably small in relation to their business.

155. Old DuPont and Corteva were insolvent at the time or became insolvent as a result of the Vylor Transfers.

156. At the time that the Vylor Transfers were made, Old DuPont and Corteva intended to incur, or believed, or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

157. Plaintiffs have been harmed as a result of the Vylor Transfers.

158. Under I.C. § 32-18-2-1 et seq., Plaintiffs are entitled to void the Vylor Transfers to the extent necessary to satisfy Plaintiffs' claims; and to recover property or value transferred to Vylor; enjoin Vylor, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of

any property or value that Old DuPont transferred to it; and impose a constructive trust over such property or value for the benefit of Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against Old DuPont, Corteva, and Vylor as follows:

a. Avoiding the Vylor Transfers to the extent necessary to satisfy Plaintiffs' claims against Old DuPont and Corteva;

b. Entering judgment declaring that Vylor must satisfy Plaintiffs' claims against Old DuPont and Corteva;

c. Entering a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction enjoining Old DuPont and Corteva from further disposition of any proceeds of the Vylor Spinoff or any other property for less than reasonably equivalent value until Plaintiffs' claims are satisfied, including any distributions of any kind to their respective shareholders;

d. Entering a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction enjoining Vylor, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Old DuPont or Corteva transferred to it;

e. Imposing a constructive trust over the Vylor Transfers for the benefit of Plaintiffs;

f. Awarding Plaintiffs prejudgment interest, attorneys' fees, and costs; and

g. Awarding Plaintiffs such other relief as this Court deems appropriate.

Date: October 1, 2026

Respectfully submitted,

**FOR THE STATE OF INDIANA**

**THEODORE E. ROKITA,**
**ATTORNEY GENERAL FOR THE STATE OF INDIANA**

*/s/ Scott L. Barnhart*
Scott L. Barnhart
Attorney No. 25474-82
Cory C. Voight
Attorney No. 23180-49
Betsy M. DeNardi
Attorney No. 23856-71
Office of Attorney General
Indiana Gov't Center South
302 West Washington St.
5th Floor
Indianapolis, IN 46204
Telephone: (317) 232-6309
Fax: (317) 233-7979
Scott.barnhart@atg.in.gov
Cory.voight@atg.in.gov
Betsy.denardi@atg.in.gov

**FOR THE STATE OF ALASKA**

**CORI MILLS, ACTING ATTORNEY GENERAL**

By: */s/ Jane Steiner Mores*
Jane Steiner Mores*
Sr. Asst. Atty General
AK Bar No. 9011115
jane.mores@alaska.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF FLORIDA**

**JAMES UTHMEIER**
**ATTORNEY GENERAL OF FLORIDA**

By: */s/ Lizabeth A. Brady*
Lizabeth A. Brady*
Director, Antitrust Division
Florida Bar No. 457991
Tyler A. Kovacs*
Assistant Attorney General
Florida Bar No. 1044676
PL-01, The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-9134
Liz.Brady@myfloridalegal.com
Tyler.Kovacs@myfloridalegal.com

**Pro hac vice forthcoming*

**FOR THE GOVERNMENT OF GUAM**

**DOUGLAS MOYLAN**
**ATTORNEY GENERAL OF GUAM**

By: */s/ Joseph A. Guthrie*
Joseph A. Guthrie*
Chief Deputy Attorney General
Bank of Hawaii Building
134 W. Soledad Avenue,
4th Floor, Suite 412
Hagåtña, GU 96910
Telephone: (671) 475-2710
Facsimile: (671) 472-2493
jguthrie@oagguam.org

**Pro hac vice forthcoming*

**FOR THE STATE OF MAINE**

**AARON M. FREY**
**ATTORNEY GENERAL**

*/s/Mark A. Bower*
Mark A. Bower*
Assistant Attorney General
6 State House Station
Augusta, Maine 04333
Phone: (207) 626-8566
Email: Mark.Bower@maine.gov

*Pro hac vice forthcoming*

**FOR THE STATE OF MARYLAND**

**ANTHONY G. BROWN**
**ATTORNEY GENERAL OF MARYLAND**

*/s/Patricia V. Tipon*
Patricia V. Tipon*
Attorney No. 0806170244
Julie Kuspa*
Attorney No. 0912160009
Assistant Attorneys General
Office of the Attorney General
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
(410) 537-3061
(410) 537-3943 (facsimile)
patricia.tipon@maryland.gov
julie.kuspa@maryland.gov

*Pro hac vice forthcoming*

**FOR THE COMMONWEALTH OF MASSACHUSETTS**

**ANDREA JOY CAMPBELL**
**ATTORNEY GENERAL**

/s/ *Nancy E. Harper*
Nancy E. Harper*
Assistant Attorney General, Chief
Louis Dundin*
Assistant Attorney General, Deputy Chief
I. Andrew Goldberg*
Jillian Riley*
Assistant Attorneys General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
betsy.harper@mass.gov
louis.dundin@mass.gov
andy.goldberg@mass.gov
jillian.riley@mass.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF NEW HAMPSHIRE**

**JOHN M. FORMELLA**
**ATTORNEY GENERAL**

/s/ *Christopher G. Aslin*
Christopher G. Aslin*
Senior Assistant Attorney General
Chief, Environmental Protection Bureau
Department of Justice
1 Granite Place South
Concord, NH 03301
(603) 271-3679
christopher.g.aslin@doj.nh.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF NEW MEXICO**

**RAÚL TORREZ**
**ATTORNEY GENERAL**

*/s/ Esther C. Jamison*
Esther C. Jamison*
Assistant Attorney General
New Mexico Department of Justice
Environmental Protection Bureau
408 Galisteo Street
Santa Fe, NM 87501
(505) 627-3474
ejamison@nmdoj.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF OREGON**

**DAN RAYFIELD**
**ATTORNEY GENERAL**

By: */s/ Deanna Chang*
Deanna Chang*
#192202
Senior Assistant Attorney General
Trial Attorney
Tel (971) 673-1880
Fax (971) 673-5000
Deanna.J.Chang@doj.oregon.gov

**Pro hac vice forthcoming*

**FOR THE COMMONWEALTH OF PENNSYLVANIA**

**OFFICE OF ATTORNEY GENERAL**
**DAVID W. SUNDAY, JR., ATTORNEY GENERAL**

By: */s/ Neil F. Mara*
By: */s/ Cheryl P. Jacobs*
Neil F. Mara*
Chief Deputy Attorney General
Cheryl P. Jacobs*
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
1000 Madison Avenue Suite 310
Norristown, PA 19403

**Pro hac vice forthcoming*

**FOR THE STATE OF RHODE ISLAND**

**PETER F. NERONHA**
**ATTORNEY GENERAL OF RHODE ISLAND**

By: */s/ Sarah W. Rice*
Sarah W. Rice*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Fax: (401) 222-2995
srice@riag.ri.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF TENNESSEE**

**JONATHAN SKRMETTI**
(BPR No. 31551)
**ATTORNEY GENERAL AND REPORTER**

*/s/ Amanda Callihan*
Amanda Callihan* (BPR No. 035960)
Senior Assistant Attorney General
Environmental Division
Jeff Hill* (BPR No. 16731)
Special Counsel for Public Protection
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37207
Tel: (615) 741-3491
Amanda.Callihan@ag.tn.gov
Jeff.Hill@ag.tn.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF TEXAS**

**KEN PAXTON**
**ATTORNEY GENERAL OF TEXAS**

*/s/ Katie B. Hobson*
Katie B. Hobson *
State Bar No. 24082680
Jake Marx*
State Bar No. 24087989
Brittany Wright*
State Bar No. 24130011
Assistant Attorneys General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel. (512) 463-2012
Fax. (512) 320-0911
Katie.Hobson@oag.texas.gov
Brittany.Wright@oag.texas.gov
Jake.Marx@oag.texas.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF VERMONT**

**CHARITY R. CLARK**
**VERMONT ATTORNEY GENERAL**

By: *<u>/s/ Laura B. Murphy</u>*
Laura B. Murphy*
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3186
laura.murphy@vermont.gov

**Pro hac vice forthcoming*

**FOR THE STATE OF WASHINGTON**

**NICK BROWN**
**ATTORNEY GENERAL**

By: *<u>/s/ Timothy E. Allen</u>*
By: *<u>/s/ Junine So</u>*
Timothy E. Allen*
WA Bar No. 29415
Junine So*
WA Bar No. 58779
Assistant Attorneys General
Environmental Protection Division
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
Tel. (206) 464-7744
timothy.allen@atg.wa.gov
junine.so@atg.wa.gov

**Pro hac vice forthcoming*

**TAFT STETTINIUS & HOLLISTER, LLP**

*/s/ Tracy N. Betz*
Tracy N. Betz, Atty No. 24800-53
One Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713-3500
tbetz@taftlaw.com

*Attorneys for Plaintiffs the State of Indiana, Government of Guam, State of New Hampshire, State of New Mexico, State of Oregon, State of Rhode Island, State of Tennessee, State of Texas, and State of Washington*

**KELLEY DRYE & WARREN, LLP**

*/s/ John D.S. Gilmour*
John D.S. Gilmour*
William J. Jackson*
Lana Rowenko*
Kelley Drye & Warren, LLP
515 Post Oak Blvd., Suite 900
Houston, TX 77027
713-355-5055
jgilmour@kelleydrye.com
bjackson@kelleydrye.com
lrowenko@kelleydrye.com

David I. Zalman*
Levi M. Downing*
Elizabeth N. Krasnow*
Lauren E. Schadt*
Zoe P. Makoul*
Kelley Drye & Warren, LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
dzalman@kelleydrye.com
ldowning@kelleydrye.com
ekrasnow@kelleydrye.com
lschadt@kelleydrye.com
zmakoul@kelleydrye.com

Matthew F. Chakmakian*
Kelley Drye & Warren, LLP
7 Giralda Farms, Suite 340
Madison, NJ 07940
mchakmakian@kelleydrye.com

**Pro hac vice forthcoming*

*Attorneys for Plaintiffs the State of Indiana, State of Alaska, Goverment of Guam, State of Maryland, Commonwealth of Massachusetts, State of New Hampshire, State of New Mexico, State of Oregon, State of Rhode Island, State of Tennessee, State of Texas, and State of Washington*