**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| STATE OF INDIANA,<br>STATE OF ALASKA,<br>STATE OF FLORIDA,<br>TERRITORY OF GUAM,<br>STATE OF MAINE,<br>STATE OF MARYLAND,<br>COMMONWEALTH OF MASSACHUSETTS,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF NEW MEXICO,<br>STATE OF OREGON,<br>COMMONWEALTH OF PENNSYLVANIA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF VERMONT,<br>STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>EIDP, INC. FORMERLY KNOWN AS E.I. DU PONT DE NEMOURS AND CO.,<br>CORTEVA, INC.,<br>VYLOR, INC.,<br><br>Defendants. | ) | No. 1:26-cv-02122-TWP-MG |

**<u>ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

Many Americans are familiar with E.I. Du Pont de Nemours and Company, often called the "DuPont" company. DuPont is a long-standing American company with a storied history, having introduced several popular household brands like Teflon and Stainmaster. But in recent decades, the spotlight has shifted to DuPont's historical use and production of man-made "forever chemicals" known as "PFAs." Numerous lawsuits have been filed against DuPont and its corporate affiliates related to the myriad harm allegedly caused by PFAs, and the number of suits continues to grow. Earlier this month, the sixteen states and sovereigns (collectively, "Plaintiffs") here, sued

EIDP, Inc., formerly known as E.I. Du Pont de Nemours and Co. ("DuPont"); DuPont's parent, Corteva, Inc. ("Corteva"); and a newly formed former affiliate, Vylor, Inc. ("Vylor") (collectively, "Defendants"), claiming DuPont and Corteva fraudulently transferred their most valuable assets, but no PFAs-related liabilities, to Vylor in an attempt to evade the billions of dollars in damages that DuPont and Corteva are, or will become, obligated to pay.

This matter is now before the Court on the Plaintiffs' Motion for a Temporary Restraining Order (Filing No. 27), which seeks an emergency temporary order to prevent the dissipation of Defendants' assets, pending the Court's ruling on Plaintiffs' anticipated motion for preliminary injunction. For the reasons explained below, Plaintiffs' Motion for Temporary Restraining Order is **granted**.

## I. BACKGROUND

This section is not intended to provide a comprehensive explanation of all the facts in this case; rather, it provides only the background relevant to the issues before the Court.

### A. DuPont's Use of PFAs and PFAs Litigation

In the early 1950s, DuPont began purchasing man-made chemicals known as PFAs, which is short for per- and polyfluoroalkyl substances, for use in their manufactured products (Filing No. 29-1 at 9; Filing No. 28-33 at 6; Filing No. 28-46). For the next several decades, DuPont used, produced, or manufactured PFAs and products containing PFAs, including cookware and food packaging (Filing No. 30-1 ¶ 63). The downstream purchasers of DuPont's PFAs-containing products included paper mills, manufacturers of textiles, carpets, and semi-conductors, as well as manufacturers of an aqueous film-forming foam ("AFFF"), which is used at fire departments, airports, military installations, and other facilities (Filing No. 1 at 4; Filing No. 29-1 at 27, 30; Filing No. 30-1 ¶ 111). As a result of DuPont's use, production, and sale of PFAs, as well as the

release of PFAs into the air and water, nearly all Americans allegedly have measurable amounts of PFAs in their blood (Filing No. 29-1 at 18; Filing No. 28-26; Filing No. 28-33).

PFAs are not readily degradable, and exposure to PFAs has been linked to types of cancers, pregnancy conditions, thyroid disease, and other conditions (Filing No. 29-1 at 17–18; Filing No. 30-1 ¶ 19). As early as 1961, DuPont knew of harms associated with PFAs (Filing No. 28-22, Filing No. 28-24 through Filing No. 28-27, Filing No. 28-29; Filing No. 28-30; Filing No. 28-33), but DuPont did not disclose these risks and continued marketing its PFAs-containing products to American families (Filing No. 28-32; Filing No. 28-33; Filing No. 28-50).

The dangers and permanence of PFAs—and DuPont's knowledge of the same—was made public in 1999 and 2000, amid a lawsuit filed by farmer Wilbur Tennant against DuPont. *Tennant v. E.I. DuPont de Nemours & Co.*, No. 99-cv488 (S.D.W. Va. Oct. 21, 1999). Since the *Tennant* lawsuit settled, DuPont has been the defendant in numerous lawsuits, including class action lawsuits, multi-district litigation ("MDL"), and lawsuits filed by federal and state governments. In or around 2013, an MDL was formed in Ohio to handle roughly 3,500 personal injury claims by plaintiffs who alleged that they became sick after drinking water contaminated with a type of PFA. DuPont lost every Ohio MDL bellwether case that went to trial and eventually settled the Ohio MDL for an aggregate $812.7 million.

The first lawsuit filed by a state was filed in Ohio in 2018 and settled for $110 million (Filing No. 30-1 ¶ 69). In 2019, New Jersey filed five suits against DuPont, which resulted in a collective settlement in 2025 requiring DuPont to pay $875 million, establish remediation funding sources of up to $1.2 billion, and remediate four sites in New Jersey to the state's satisfaction (Filing No. 28-37). In 2020, North Carolina filed a suit against DuPont, which settled in 2026 (a few weeks before the Vylor spin-off at issue here). In the North Carolina lawsuit, DuPont and

related entities agreed to pay $455 million and establish a $135 million remediation funding source (Filing No. 30-1 ¶ 71). DuPont remains a defendant in forty-six suits brought by several states seeking damages for PFAs and/or AFFF contamination (Filing No. 28-2 through Filing No. 28-21). Most of these suits have been consolidated into an MDL in the District of South Carolina. *In re AFFF*, 357 F. Supp. 3d 1391, 1392 (J.P.M.L. 2018); *In re AFFF*, 2:18-mn-02873 (D.S.C.) (the "AFFF MDL"). The AFFF MDL also includes consumer protection claims, as well as claims for water contamination, personal injury, property damages, nuisance, trespass, and negligence. A variety of claims both within and outside of the AFFF MDL remain pending. To date, verdicts or settlements in these cases have resulted in DuPont and affiliates agreeing to pay hundreds of millions of dollars (Filing No. 30-1 ¶¶ 67–68, 189–91; Filing No. 32-1 ¶¶ 82–83).

**B. Earlier Corporation Reorganizations**

In 2013, while several bellwether trials were being scheduled in the Ohio MDL, DuPont's management began to consider corporate restructuring (Filing No. 1-3 ¶ 63). In 2014, DuPont incorporated a new wholly owned subsidiary, The Chemours Company ("Chemours"). In 2015, DuPont transferred its "performance chemicals business," which included its PFAs-related assets, to Chemours. DuPont then spun off Chemours as a separate public company, but as part of the spin-off, Chemours agreed to assume DuPont's liabilities related to its performance chemicals business, including the use and manufacture of PFAs (Filing No. 28-41; Filing No. 28-42; Filing No. 32-1 ¶¶ 85–92).

In 2019, DuPont underwent a second restructuring, which led to the creation of Defendant Corteva. DuPont agreed to a "merger" with Dow Chemical Company ("Dow"). DuPont and Dow formed a new shared parent company called DowDuPont and reorganized their assets into three entities, each of which was assigned a business line: (1) DuPont de Nemours ("New DuPont") was assigned specialty products; (2) the newly formed Dow, Inc., was assigned the materials business;

and (3) the newly formed Corteva was assigned the agricultural business. DuPont became a subsidiary of Corteva (Filing No. 32-1 ¶¶ 20, 93–95; Filing No. 1-3 ¶ 79 (graphic of 2019 restructure)). Corteva and Dow, Inc., were then spun off into independent, publicly traded companies. *Id.* As part of the 2019 restructure, Corteva and New DuPont agreed to indemnify each other for costs related to (old) DuPont's "discontinued . . . businesses," with Corteva covering 29% of the costs and New DuPont covering the other 71% (Filing No. 50-2).

In 2019, Chemours sued DuPont, Corteva, and New DuPont alleging that DuPont had "dumped" its PFAs liabilities onto Chemours, and if those liabilities were uncapped, then Chemours was essentially insolvent as of the date it was spun off from DuPont (Filing No. 28-44). During that litigation, DuPont's attorney argued to the court that the Chemours spin-off was not fraudulent because liability that existed prior to the spin-off "continue[d] to sit exactly where it ever sat. It hasn't been changed at all." (Filing No. 28-60; Hearing Ex. 1); *see State ex rel. Stein v. E.I. du Pont de Nemours & Co.*, No. 20 CVS 5612 (N.C. Sup. Ct. June 29, 2021), *see State ex rel. Stein v. E.I. du Pont de Nemours & Co.*, 879 S.E.2d 537, 563 (N.C. 2021) ("Corteva and New DuPont expressly assumed Old DuPont's PFAS liabilities."). Ultimately, the parties settled Chemours' claims in 2021, with New DuPont and Corteva agreeing to contribute $2 billion toward the next $4 billion in Chemours' PFAs liabilities (Filing No. 28-45; Filing No. 32-1 ¶¶ 105–06; Filing No. 50-3 at 13–14). Plaintiffs allege that the $4 billion cost-sharing agreement is nearing its exhaustion (Filing No. 32-1 ¶¶ 27, 111).

**C. <u>The Vylor Spin-Off</u>**

On October 1, 2025—just months after the settlement between DuPont and the State of New Jersey valued at over $2 billion dollars—Corteva announced another corporate reorganization that would separate DuPont's two business lines—Seed and Crop Protection—into separate companies (Filing No. 28-36 at 2–3). Corteva contemporaneously announced that some of its

leadership would leave Corteva to manage the newly formed companies. *Id.* According to Corteva's CFO, one primary reason for this reorganization was the "divergence" of seed and crop protection markets (Filing No. 49 ¶¶ 7–9). Stated differently, Corteva determined that the two businesses would be more valuable separate than together. *Id.* Corteva also formed a committee to consider this reorganization, engaged several advisors, and solicited and received capital adequacy opinions from third parties before consummating this reorganization. *Id.* ¶ 16–20.

Prior to this most recent reorganization, DuPont had both the Seed and Crop Protection business lines (Filing No. 1-3 ¶ 122). The Seed business was the more valuable of the two lines, constituting about three-quarters of DuPont's assets. DuPont's flagship seed brand holds approximately 40% of the North American corn seed market and is the number one planted corn and soybean brand in the United States. *Id.* ¶ 125; (Filing No. 32-1 ¶¶ 125). Corteva's primary asset was DuPont and DuPont's business lines (Filing No. 1-3 ¶ 124). A fair value of the Seed business is $40.66 billion, while a fair value of the Crop Protection Business is $13.95 billion (Filing No. 32-1 ¶ 72, Table 6).

In November 2025, Corteva incorporated Vylor as a new, wholly owned subsidiary. *Id.* ¶ 128. Following several reorganizational steps, all of DuPont's Seed business (worth over $40 billions) was transferred to Vylor (Filing No. 28-55; Filing No. 32-1 ¶¶ 143, 394). Vylor did not assume any of DuPont's (or Corteva's) liabilities related to PFAs. In connection with the asset transfer to Vylor, DuPont received approximately $5.1 billion in consideration ($1.6 billion in the form of a debt exchange, and approximately $3.5 billion in cash) (Filing No. 32-1 ¶¶ 32, 34, 73, 144). DuPont was also left with the Crop Protection business (worth $13.95 billion), and its PFAs liabilities. Corteva maintains, however, that its Crop Protection business "is one of the largest and most profitable in the world, with a projected EBITDA of $1.3 billion," "$1.5 billion in year-end

cash," only $1 billion in "gross debt," and "limited" pension liabilities (Filing No. 48 at 10 (citing Filing No. 49 ¶¶ 24–27)).

In an October 2025 investor call, someone expressed "investor concerns" about "currently not recognized liabilities . . . that's potentially driving the [Vylor] move," and wanted "explicit[] confirm[ation] . . . that there's no surprises coming here." (Filing No. 28-59 at 14). Corteva's CEO responded, "when you look at the litigation as it stands today, we expect our [Crop Protection] obligations will stay with [Crop Protection], along with the historical DuPont pension plan and our PFAS obligations. . . . So, today, when you look at these obligations around the DuPont pension and PFAS, they're in Corteva today and they'll remain [with] Corteva in the future." *Id.*

During a May 2026 call, Corteva's CFO was asked how investors should think about the "capital structure" of the new separate businesses, and the CFO responded that "when the board does final approval towards the actual split, . . . our major considerations are going to be one, . . . where the liabilities sit, liabilities are going to stay with the company that they're in today." (Filing No. 28-39 at 16).

On October 1, 2026, Corteva distributed Vylor stock to its shareholders, spinning off Vylor into an independent public company (Filing No. 32-1 ¶ 143(f)). After the spin-off, Corteva and Vylor were given BBB+ ratings by S&P Global and Fitch Ratings (Filing No. 49 ¶ 27).[1]

**D. <u>Procedural History</u>**

Currently, the AFFF MDL in the District of South Carolina remains pending. On September 14, 2026, California moved for leave to file a TRO in the AFFF MDL, seeking to stop the Vylor

[1] S&P and Fitch both give public credit ratings related to an entity's ability to meet its financial commitments. Ratings generally range from AAA to D, with BBB- and above being "investment grade" and BB+ and below being "speculative grade." The "+" or "-" further reflects the probability of default. *Rating Definitions*, FitchRatings, https://www.fitchratings.com/products/rating-definitions; *Understanding Credit Ratings*, S&P Global, https://www.spglobal.com/ratings/en/credit-ratings/about/understanding-credit-ratings.

spin-off. The next day, the District of South Carolina denied the request for leave, finding that the venues where Defendants were incorporated or had their principal offices (*i.e.*, Delaware or Indiana) were better suited to address the requested TRO. The Fourth Circuit quickly reversed, finding that the South Carolina court had jurisdiction to rule on the TRO. On September 30, 2026, the District of South Carolina denied California's motion for a TRO, finding that remedies at law would be available for plaintiffs. On October 2, 2025, California again appealed the denial of its motion for TRO to the Fourth Circuit, and that appeal remains pending.

Plaintiffs initiated this lawsuit in the Marion Superior Court on October 1, 2026, shortly after the Vylor spin-off was completed, and moved for a TRO in state court (Filing No. 1-3). Defendants removed this action the same day pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1) (Filing No. 1).

The parties participated in a telephonic status conference with the Magistrate Judge on October 2, 2026 (Filing No. 19), at which deadlines were set, including Plaintiffs' deadline to file an updated motion for TRO, Defendants' deadline to respond, and a hearing date on the Motion for TRO. Later that day, Defendants filed a Motion to Stay Proceedings Pending Transfer by the Judicial Panel on Multidistrict Litigation[2] (Filing No. 22). Plaintiffs' response to the Motion to Stay is due October 13, 2026, so the Motion to Stay is neither ripe nor presently before the Court (Filing No. 31).

Plaintiffs filed the instant, updated Motion for TRO and supporting brief on October 5, 2026 (Filing No. 27; Filing No. 34). Defendants responded on October 6, 2026 (Filing No. 48).

[2] On the morning of October 8, 2026, shortly before oral argument in this matter, the Judicial Panel on Multidistrict Litigation issued an entry that the Clerk of the Panel determined that the instant matter "is not appropriate for inclusion" in the AFFF MDL. *In re: Aqueous Film-Forming Foams Products Liability Litigation*, Dkt. 4675, MDL No. 2873 (J.P.M.L. Oct. 8, 2026). Defendants asserted at oral argument that the Clerk's determination will likely be the subject of future challenges.

On October 8, 2026 (Filing No. 75), the Court held a hearing on the Motion for TRO at which both parties presented their arguments. Also at the hearing, Plaintiffs submitted three supplemental exhibits and a list of supplemental case law, in lieu of filing a reply brief. The Motion for TRO is now ripe for the Court's review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) provides that a temporary restraining order may be issued without notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(d). In this case, Defendants have been put on notice regarding Plaintiffs' Motion for TRO and have had an opportunity to respond in writing and at oral argument. When a defendant has notice of a motion for a temporary restraining order and opportunity to respond, the standards that apply to preliminary injunction orders also apply to temporary restraining orders. *Loveless v. Chi. Bd. of Election Comm'rs*, No. 04 C 5671, 2004 WL 2095662, at *2 (N.D. Ill. Sep. 8, 2004).

To obtain a temporary restraining order, the moving party has the burden of showing that "it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuing an injunction is in the public interest." *Grace Schs. v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009). A temporary restraining order "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Goodman v. Ill. Dep't of Fin. & Prof'l Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (emphasis in original) (quoting

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (granting preliminary injunctive relief is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it").

## III. DISCUSSION

Plaintiffs assert claims for fraudulent transfer, alleging that DuPont and Corteva transferred most of their asset value, but none of their liabilities, to Vylor in an attempt to fraudulently avoid paying current and future damages related to DuPont's use and production of PFAs. Plaintiffs seek a TRO to prevent the dissipation of Defendants' assets pending a ruling on an anticipated motion for preliminary injunction. The proposed TRO would temporarily enjoin Defendants from issuing shareholder dividends, engaging in stock buy-backs, or otherwise disposing of assets "outside the ordinary course of [their] business operations."

As initial procedural matters, Defendants argue that Plaintiffs' Motion for TRO should be denied because Plaintiffs are estopped by the District of South Carolina's order denying California's motion for a TRO, which the instant Plaintiffs knew about and supported; Plaintiffs' claims are duplicative of the South Carolina AFFF MDL; and Plaintiffs unduly delayed in seeking emergency injunctive relief. Defendants also argue that this Court cannot issue an "asset freeze" under the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).

The Court will address Defendants' arguments regarding estoppel, duplication, and delay, and their arguments under *Grupo Mexicano*, before turning to whether Plaintiffs have satisfied each of the elements of a preliminary injunction.

### A. Estoppel, Duplication of Claims, and Undue Delay

Defendants first argue that Plaintiffs are estopped by the District of South Carolina's denial of California's motion for a TRO in the AFFF MDL (Filing No. 48 at 15–16). Relatedly, Defendants

argue that Plaintiffs' fraudulent transfer claims are duplicative of claims in the AFFF MDL and should be stayed pending transfer to the AFFF MDL. Defendants lastly argue that Plaintiffs unduly delayed in bringing this lawsuit and Motion for TRO, since they have known about the impending Vylor spin-off since 2025.

The Court disagrees with each of Defendants' arguments. First, the District of South Carolina's order is not binding in this action or on these Plaintiffs, who supported but did not formally join in California's motion. Moreover, the District of South Carolina decided California's motion at a different posture, based on different evidence and a different type of requested relief. In particular, California moved to prevent the Vylor spin-off, argued that the spin-off itself would cause irreparable harm, and sought to enjoin the spin-off. The movants, timing, evidence, and requested relief are different in this case. Second, the question as to whether Plaintiffs' claims should be transferred to the AFFF MDL will be addressed by the Judicial Panel on Multidistrict Litigation, and the appropriateness of a stay pending transfer will be discussed when the Court rules on Defendants' Motion to Stay, which is not yet ripe for ruling (Filing No. 22). At this stage, the Court does not see indications of forum shopping or the waste of judicial resources that would counsel against ruling on Plaintiffs' Motion for TRO. And third, the Court finds no undue delay. At oral argument, Plaintiffs noted that they filed this action within hours of their claims becoming ripe, which occurred when the Vylor spin-off was completed on October 1, 2026.

**B. _*Grupo Mexicano*_**

Defendants next argue that Plaintiffs' requested injunctive relief is barred under the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) (Filing No. 48 at 20–23). "That decision held that a district court may not issue an injunction freezing assets in an action for money damages where no equitable interest is claimed." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (citing *Grupo Mexicano*,

527 U.S. at 333). "However, the court specifically noted that a restraint on assets was still proper if a suit sought equitable relief." *Id.* (citing *Grupo Mexicano*, 527 U.S. at 333; *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288 (1940)). The Supreme Court explicitly "express[ed] no opinion" as to whether or how its holding in *Grupo Mexicano* applies to claims and relief under the Uniform Fraudulent Transfers Act. 527 U.S. at 324, n.7.

In this action, Plaintiffs do not request damages and seek only equitable relief, including voiding the asset transfers to Vylor, the imposition of a constructive trust, and a declaratory judgment (Filing No. 1-3 at 36). These equitable remedies do not seek solely to facilitate the recovery of damages in this lawsuit, so Plaintiffs' proposed TRO is not barred by *Grupo Mexicano*. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."). The cases cited by Defendants, in which injunctive relief was barred, are inapplicable because the plaintiffs in those cases sought only damages. *E.g.*, *Dong v. Miller*, No. 16-CV-5836, 2018 WL 1445573, at *1 (E.D.N.Y. Mar. 23, 2018) ("[B]ecause Plaintiff only seeks money damages in connection with his fraudulent-conveyance claims—not, for example, to void the allegedly fraudulent conveyances—those claims are properly classed as legal, not equitable, and the court may not issue a preliminary injunction to preserve assets to satisfy a judgment in Plaintiff's favor on those claims."); *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Development & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 388 (S.D.N.Y. 2003) ("The plaintiff here, like the plaintiffs in *Grupo Mexicano*, brings an action at law primarily for a money judgment against the defendants.").

The fact that Plaintiffs are seeking, or may seek, monetary damages in other lawsuits is not dispositive. Plaintiffs' requested relief is not barred by *Grupo Mexicano*.

**C. Preliminary Injunction Elements**

As previously stated, to obtain emergency injunctive relief, Plaintiffs must establish: (1) that they are likely to succeed on the merits of their claims; (2) that they have no adequate remedy at law; (3) that they are likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in their favor; and (5) issuing the injunction is in the public interest. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). The first two factors are threshold determinations. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Gr,. Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

The Court will first address Plaintiffs' likelihood of success on the merits of their fraudulent transfer claims, then whether Plaintiffs have shown irreparable harm with no adequate remedy at law, and lastly the balance of harms and public interest.

**1. Success on the Merits**

A party moving for preliminary injunctive relief need not demonstrate a likelihood of "absolute success on the merits." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). However, the plaintiff "must demonstrate that 'its claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Ty, Inc.*, 237 F.3d at 895). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* (citing *Ty, Inc.*, 237 F.3d at 895).

Plaintiffs assert a constructive fraudulent transfer claim and actual fraudulent transfer claim against Defendants pursuant to the Uniform Fraudulent Transfers Act ("UFTA"), codified in Indiana at Indiana Code § 32-18-2-1–23. The applicable statutes for constructive (Ind. Code § 32-

18-2-15) and actual (Ind. Code § 32-18-2-14) fraudulent transfers create causes of action for "creditors," as that term is defined in the UFTA (Ind. Code § 32-18-2-2(2)–(3)). Defendants do not dispute that Plaintiffs are "creditors" under the UFTA.

Plaintiffs argue they are likely to succeed on the merits of both their constructive and actual fraudulent transfer claims. The Court addresses each in turn.

**a. <u>Constructive Fraudulent Transfer</u>**

A constructive fraudulent transfer under Indiana Code § 32-18-2-15 requires a plaintiff to show that (i) the debtor made a transfer without receiving "reasonably equivalent value in exchange"; and (ii) the debtor was insolvent at the time or became insolvent after the transfer. "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." Ind. Code § 32-18-2-12. At this stage, Defendants do not dispute that the Vylor spin-off was made without giving DuPont "reasonably equivalent value in exchange." (Filing No. 48 at 31 n.10). The Court therefore focuses on whether DuPont and Corteva became "insolvent" after the spin-off.

Generally, a fair valuation reflects the price that a buyer is willing to pay in an arm's length transaction. *See In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 92–93 (7th Cir. 1986); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) ("'To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent.").

Plaintiffs contend that after the Vylor spin-off, a fair valuation of DuPont's[3] Crop Protection business is $13.95 billion, but a fair valuation of (a subset of) its PFAs liabilities[4] is between $34.9 and $55.9 billion, rendering DuPont insolvent (Filing No. 34 at 28). Defendants argue that Plaintiffs' valuations are riddled with errors, and that correcting even some of those errors shows that a fair valuation of DuPont is $8 billion, and its PFAs liabilities (taking into account its settlement agreement with Chemours and other cost-sharing agreements) is just over $4 billion, meaning that DuPont was solvent (Filing No. 48 at 33–34).

Both parties' arguments are primarily based on their respective experts' reports. Plaintiffs' arguments are based on three inter-related expert reports. First is a report by Dr. Mark Benotti ("Dr. Benotti") on DuPont's share of the release of a type of PFA—perfluorooctanoic acid ("PFOA")—in the United States (Filing No. 29-1). Dr. Benotti purports to be an expert in the "occurrence, fate, transport and source attributions of anthropogenic chemicals (*i.e.*, chemicals that do not naturally occur in the environment)," especially PFAs (Filing No. 29 ¶¶ 4–5). Second is a report by Dr. David Sunding ("Dr. Sunding") on DuPont's PFAs liabilities (Filing No. 30-1). Dr. Sunding purports to be an expert in environmental economics (Filing No. 30 ¶¶ 7–8). Third is a report by Dr. David Williams ("Dr. Williams") on the value of the exchange for the Vylor spin-off and the financial health of DuPont and Corteva after the spin-off (Filing No. 32-1). Dr. Williams purports to be an expert in various areas of corporate finance, including bankruptcy, insolvency, taxation, business reorganizations, distressed business, valuations, and remedies (Filing No. 32 ¶ 5).

---

[3] For purposes of the insolvency issue, the parties discuss Corteva and DuPont as one, since Corteva's primary operating asset is DuPont. For the sake of simplicity, the Court therefore refers to Corteva and DuPont as "DuPont" when discussing insolvency.

[4] In their response, Defendants emphasize that their PFAs liabilities are limited greatly by the various agreements executed, as well as the non-assignments of liability, that were part of DuPont's 2015 and 2019 corporate reorganizations (Filing No. 48 at 32). These agreements were considered by Plaintiffs' experts in reaching their opinions as to potential PFAs liabilities.

Defendants' response is rooted in the report from their expert, Dr. Charles Mullin ("Dr. Mullin"), who purports to be an expert on "statistical and data analysis, econometrics, economic and microsimulation modeling, sample design, valuation of mass torts, and insurance allocation." (Filing No. 50-16 at 5).

Rather than summarizing each of Plaintiffs' lengthy and complex expert opinions, the Court will structure its discussion around Dr. Mullin's criticisms of those opinions (Filing No. 48 at 34). His first criticism is with Plaintiffs' experts' decision to create and use their own valuations of DuPont's assets and liabilities, rather than looking to the market's valuation of DuPont. Dr. Mullin's opines that "[o]ne does not need to estimate the Fair Market Value of publicly traded companies, such as Corteva and Vylor; the market provides it." (Filing No. 50-16 at 8). The actions of "[s]ophisticated, highly informed institutional investors . . . provide an observable price or value at which interest in these companies change hands among willing buyers and sellers," so DuPont's market capitalization, which was around $8 billion as of Dr. Mullin's report, is its fair valuation. *Id.* at 8–9.[5]

Plaintiffs' expert, Dr. Williams, did not completely ignore a market-based valuation approach. In valuing DuPont's assets, Dr. Williams considered applying the "market approach" (Filing No. 32-1 at 30), but based on available data, he decided to use a five-year "discounted cash

[5] Dr. Mullin and Defendants argue that two other considerations show that DuPont was solvent. First, Dr. Mullin notes that the law firm representing Plaintiffs also represented the State of North Carolina in a lawsuit against DuPont entities, and the terms of the settlement for that suit did not include "constraints on Corteva's ability to restructure," despite the then-impending Vylor spin-off (Filing No. 50-16 at 12). The Court fails to see how the public terms of a settlement agreement between DuPont and a different plaintiff/client has any relevance to this lawsuit. Second, at oral argument, counsel for Defendants stated that Corteva recently settled a matter in North Carolina (it is unclear whether this is the same matter referred to in Dr. Mullin's report), in which several of the Plaintiffs and the Federal Trade Commission had argued that Corteva held a monopoly over the crop protection industry in the United States. Defense counsel implied it is contradictory for Plaintiffs to have previously argued that Corteva was so large that it formed a monopoly and to now argue that Corteva is insolvent. The Court sees no contradiction in the position that Corteva is the predominant power in a specific industry, but its liabilities nevertheless outweigh its assets.

flow method" instead, *id.* at 28, 32, 147. Dr. Mullin's report does not explain how Dr. Williams' decision to use a different valuation method to estimate DuPont's assets was erroneous. Instead, he simply opines that the market is the best judge of a company's fair valuation. This difference in opinion is not a reason to discount Dr. Williams' conclusions.

More importantly, though, as Plaintiffs' note in their brief and noted at oral argument, courts have identified several compelling reasons why a company's market capitalization is an insufficient and potentially misleading estimate of a company's fair value. In *In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), the Bankruptcy Court for the Southern District of New York explained that market capitalization is susceptible to inflation, but even setting inflation concerns aside, the market can be an inaccurate reflection of a company's financial health because the documents that inform market participants need not disclose certain liabilities ("off-book" liabilities). *Id.* at 302 ("As Plaintiffs' expert Prof. Williams testified, 'the way the market might look at [these] legacy liabilities, certainly the way GAAP looks at them is different than the determination of a claim under . . . the . . . UFTA.'"). The *Tronox* court held that a positive market valuation of a company does not create a presumption of solvency for that company and cited several courts that have held the same.[6] *Id.* In cases like this one, where the company faces substantial environmental liability, "the market as a whole, no matter how efficient or inefficient, cannot be relied on to determine solvency or insolvency. . . . [T]here is no substitute for a solvency analysis." *Id.* at 302–03.

The fair value of DuPont's liabilities, then, becomes dispositive, because if Plaintiffs are likely to show that DuPont's liabilities well exceed thirty billion dollars as they contend, then they

[6] Dr. Mullin continues that the bond market—*i.e.*, DuPont's credit rating—reinforces his conclusion that DuPont was solvent after the Vylor spin-off. Dr. Mullin does not explain why credit ratings—which are presumably assigned based on the same information available to investors—is a different or better valuation metric than market capitalization.

are likely to show that DuPont (and Corteva) became insolvent after the Vylor spin-off. Dr. Williams' solvency opinion is based on: (i) his valuation of DuPont's assets as approximately $13.9 billion; (ii) Dr. Sunding's valuation of DuPont's PFAs liabilities, which is in turn based on Dr. Benotti's opinion as to DuPont's estimated share of PFOA contamination; and (iii) Dr. Williams' allocation of those liabilities to DuPont/Corteva. Dr. Mullin asserts that "errors exist" in the first basis (Dr. Williams' valuation of DuPont's assets) but declines to address those errors "given the magnitude of other errors and time constraints." (Filing No. 50-16 at 13). So the Court turns to Dr. Mullin's criticisms of Dr. Sunding's estimate of DuPont's PFAs liabilities, and then Dr. Williams' allocation of those liabilities.

In his report, Dr. Sunding estimated that DuPont's allocation of PFAs liability among all potentially responsible parties would be between 10.1% and 15.1%. The 10.1% estimate is based on DuPont's share of the settlement recovery pool in the AFFF MDL (Filing No. 30-1 at 37–38). Dr. Mullin argues that this estimate erroneously omits future potential settlements with public water systems "regardless of contamination source," which would increase "the denominator" of Dr. Sunding's calculations, but Dr. Mullin fails to explain how it was erroneous for Dr. Sunding to use DuPont's prior, known contribution to the AFFF MDL settlement pool as a data point for extrapolation. Dr. Sunding also explained that he used 10.1% as his low-end estimate because "AFFF was a relatively small specialty product for Old DuPont, whereas Old DuPont dominated the substantially larger market for fluoropolymers." (Filing No. 30-1 at 38). To estimate DuPont's percentage of all PFOA/PFA liability—not just for its limited AFFF business—Dr. Sunding relied on Dr. Menotti's opinion that DuPont was responsible for the release of roughly 32.1% of the overall amount of PFOA in the environment, and that PFOAs constitute 47% of PFA contamination in drinking water, making DuPont responsible for 15.1% of PFA contamination (32.1% released

of 47% of PFAs drinking water contamination = 15.1%). Dr. Mullin claims that Dr. Menotti's 32.1% estimate is inflated because it is based on data from a U.S. Environmental Protection Agency Stewardship Program, even though not all PFOA manufacturers participated in that Program. But Dr. Mullin himself can only estimate the "average market share" omitted from the Stewardship Program, while also acknowledging that some non-participants produced only a "negligible share of PFOA releases from fluoropolymer manufacturing." (Filing No. 50-16 at 20). Dr. Mullin then criticizes Dr. Sunding for using drinking water contamination as the basis for his 47% estimate instead of PFOA data from blood serum (Filing No. 50-16 at 22). But aside from noting that blood serum could be more closely tied to Plaintiffs' concerns about human health, Dr. Mullin cites no reason why drinking water was an erroneous source of data, or why Dr. Mullin's blood serum data (which tested only children) is the only appropriate measure. *Id.* at 23–24.

Most of Dr. Mullin's remaining errors assigned to Dr. Sunding's estimated PFAs costs are not errors, but rather disagreements about the most appropriate data to use, whether certain data should or should not have been considered, and the benefits of using certain methodologies over others (Filing No. 50-16 at 26–38). One significant purported error is that "Dr. Sunding includes . . . sites in this average cost of remediating industrial sites, despite the Combined DuPont Entities having already resolved most of the liabilities associated with their high-cost PFOA manufacturing sites." *Id.* at 29. This is simply incorrect. Dr. Sunding states that he entirely excluded remediation costs for DuPont manufacturing facilities with prior settlements (Filing No. 30-1 ¶¶ 13, 139).

The final pair of key errors identified by Dr. Mullin arise from Dr. Williams' allocation of PFAs liability between DuPont/Corteva, New DuPont, and Chemours; and his assumptions regarding DuPont's debt financing (Filing No. 50-16 at 39–40). As to the first alleged error, as part of DuPont's 2019 restructure, Corteva and New DuPont agreed to indemnify each other for

DuPont's legacy PFAs liabilities, and in Corteva/DuPont's 2021 settlement with Chemours, Corteva/DuPont agreed to assume 50% of Chemours' next $4 billion in PFAs liabilities. Dr. Mullin contends that Dr. Williams improperly reduced Chemours' share of liability from 50% to 0.1%, and "reversed" Corteva and New Dupont's share of legacy liabilities (with Corteva assuming 70% and New DuPont assuming 30%), further inflating Corteva/DuPont's liabilities. However, Dr. Williams did not simply reduce Chemours' percentage of liability; instead, he estimated the total amount that Chemours would be able to pay based on Chemours' recent financial information (which Dr. Williams acknowledged does not meet Chemours' 50% obligation) and estimated the other DuPont entities' share accordingly (Filing No. 32-1 at ¶¶ 65, 301–02). Dr. Williams also did not "reverse" Corteva and New DuPont's percentage obligations, as Dr. Mullin contends. Consistent with the Defendants' 2019 agreements, Dr. Williams attributed 29% of liabilities to Corteva, and 71% to New DuPont (Filing No. 32-1 ¶¶ 21, 28, 113, 303). As Plaintiffs explained at oral argument, Dr. Mullin's confusion appears to arise from Dr. Williams' further allocation of New DuPont's 71% obligation between New DuPont (56%) and Qnity (44%), meaning that of the total obligations, Corteva bears 29%, New DuPont bears 39.76% (56% of New DuPont's 71%), and Qnity bears 31.24% (44% of New DuPont's 71%).

As to the second error (and the final one addressed in this Order), Dr. Mullin contends that Dr. Williams erred in assuming that companies can only use debt to satisfy their obligations, and assuming that DuPont would incur debt at a high interest rate associated with "junk" investments, when DuPont currently has an investment-grade rating (Filing No. 50-16 at 40–42). The dispute between Dr. Mullin and Dr. Williams regarding a company's methods of satisfying obligations again appears to be a disagreement between experts, rather than an error by Dr. Williams. Dr. Williams' decision to assume higher interest rates is not unsupported by evidence or analysis. Dr.

Williams explains that his assumed interest rate was based on evidence of New DuPont and Qnity's recent borrowing data and anticipated trends in cash flow as a result of making liability payments (Filing No. 32-1 ¶¶ 316–17).

In sum, although Defendants have offered valid critiques of Plaintiffs' expert reports, those critiques fail to identify any significant errors in Plaintiffs' expert reports, and Dr. Mullin's remaining disputes are too generalized and underdeveloped at this stage to negate the persuasiveness of Plaintiffs' reports. Dr. Mullin even acknowledges in his report that due to present time constraints, he was unable to "verify[] or assess[] most of the underlying calculations in [Plaintiffs'] TRO Reports." (Filing No. 50-16 ¶ 8). Based on the present record, the Court finds that Plaintiffs have shown a very strong likelihood of showing that DuPont/Corteva became insolvent after the Vylor spin-off, and thus a very strong likelihood of succeeding on the merits of their claim for constructive fraudulent transfer.

Plaintiffs need only show a likelihood of success on one of their claims to obtain preliminary injunctive relief. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096 (citing *Ty, Inc.*, 237 F.3d at 897). But in the interest of thoroughness, the Court addresses Plaintiffs' claim for actual fraudulent transfer as well.

**b. Actual Fraudulent Transfer**

To show an actual fraudulent transfer, Plaintiffs must show that Defendants acted "with actual intent to hinder, delay, or defraud any creditor of the debtor." Ind. Code § 32-18-2-14(a)(1), Plaintiffs may show such intent either with direct evidence or indirectly with evidence of "badges of fraud." *Freeland v. Enodis Corp.*, 540 F.3d 721, 733 (7th Cir. 2008) (citing *United States v. Denlinger*, 982 F.2d 233, 236 (7th Cir. 1992)). The UFTA provides a non-exhaustive list of these "badges of fraud":

> (1) the debtor retained possession or control of the property transferred after the transfer;
>
> (2) the transfer or obligation was disclosed or concealed;
>
> (3) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
>
> (4) the transfer was of substantially all the debtor's assets;
>
> (5) the debtor absconded;
>
> (6) the debtor removed or concealed assets;
>
> (7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and
>
> (9) the transfer occurred shortly before or shortly after a substantial debt was incurred.

Ind. Code § 32-18-2-14(b). "No one badge of fraud constitutes a per se showing of fraudulent intent," but "the presence of a number of badges of fraud is said to create an overwhelming presumption of fraud or to raise a strong inference of fraudulent intent." *Freeland*, 540 F.3d at 733 (cleaned up) (quoting *Denlinger*, 982 F.2d at 236; *Buffington v. Metcalf*, 883 F. Supp. 1198, 1200 (S.D. Ind. 1994)).

Plaintiffs argue that direct and indirect evidence support their claim. As direct evidence, Plaintiffs cite the May 2026 statement by Corteva's CFO that DuPont's PFAs liabilities were a "major consideration" in approving the Vylor split and spin-off (Filing No. 28-39 at 16; Filing No. 34 at 30). Defendants respond that the liabilities were merely a consideration, and the true reason for the split was a loss of long-term synergy between the seed and crop protection businesses (Filing No. 48 at 29–30; Filing No. 49 ¶¶ 7–12). While DuPont's PFAs liabilities may not have been the sole reason for the Vylor spin-off, considering that DuPont publicly focused on the PFAs liabilities before the split and have offered this new rationalization only after this lawsuit was

initiated, the Court finds that the CFO's earlier statements are direct evidence of Defendants' intent, albeit limited and contested evidence.

But even without this direct evidence, Plaintiffs' indirect evidence is sufficient to demonstrate a strong likelihood of success on the merits of their actual fraudulent transfer claim. As explained above, Plaintiffs' have shown that DuPont did not receive "reasonably equivalent" consideration in the Vylor transaction, and DuPont and Corteva became insolvent as a result. Ind. Code § 32-18-2-14(b)(7)–(8). Plaintiffs also claim that DuPont transferred "substantially all" of its assets to Vylor when it transferred the $40.66 billion Seed business (74.5% of DuPont's assets) and retained only the $13.95 billion Crop Protection business (25.5% of DuPont's assets). Plaintiffs cite at least two cases from the Bankruptcy Court for the District of Delaware finding that lesser transfers of assets constituted "substantially all" of the debtor's assets, particularly where, as here, the debtor faced a "tidal wave of litigation." *In re Mallinckordt PLC*, No. 20-12522, 2024 WL 206682, at *30 (Bankr. D. Del. Jan. 18, 2024); *see In re Vaso Active Pharms., Inc.*, No. 10-10855, 2012 WL 4793241, at *14 (Bankr. D. Del. Oct. 9, 2012); (Filing No. 24 at 30–31).

Two additional "badges of fraud" relate to ongoing PFAs litigation. Plaintiffs correctly point out that DuPont faces an "overwhelming" amount of lawsuits and threats of lawsuits, Ind. Code § 32-18-2-14(b)(3) (considering whether the debtor "had been sued or threatened with suit" before the transfer), and that the Vylor spin-off was announced shortly after DuPont reached a settlement with the State of New Jersey valued at around $2 billion and completed weeks after reaching a roughly $590 million settlement with the State of North Carolina, *id.* § 32-18-2-14(b)(9) (considering whether the transfer occurred "shortly before or shortly after a substantial debt was incurred"); (Filing No. 34 at 31).

Plaintiffs further show that DuPont/Corteva "retained possession or control of the property transferred after the transfer," Ind. Code § 32-18-2-14(b)(1), because even though Vylor is now an independent company, it is controlled by many of the same executives who controlled DuPont before the spin-off. *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 351 (N.D.N.Y. 2001); (Filing No. 34 at 31–32). The Court also considers that at the time the Seed business was transferred to Vylor, it was still a subsidiary of DuPont and/or Corteva. *See Holland v. Ketcham*, 181 N.E.3d 1030, 1036 (Ind. Ct. App. 2021) (stating that Indiana courts also consider, among other things, whether assets were transferred "between family members"); *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 989 (7th Cir. 2016).

In response, Defendants emphasize that this case is unlike other cases of fraudulent transfer, which often involve "closely held companies, fixed judgments, subterfuge, and rushed transactions." (Filing No. 48 at 30–31 & n.9 (citing factually distinguishable cases)). In this case, "Corteva engaged in the rigorous diligence that courts have found counsel against finding fraud," and Defendants executed the Vylor spin-off "openly and for a legitimate business purpose, which rebuts any of these 'badges.'" *Id.* a 30–31. Transparency is only one consideration in determining intent, Ind. Code § 32-18-2-14(b)(2); *see Trafalgar Power*, 131 F. Supp. 2d at 351 (identifying several badges of fraud, including, "although not secret or hasty, a transfer out of the ordinary course of business"). And the post-litigation declaration from Corteva's CFO cursorily explaining why Corteva decided to separate the Seed and Crop Protection businesses—but, importantly, not why Vylor was given the Seed business rather than the Crop Protection business—does not overcome Plaintiffs' strong indirect evidence of fraud.

On reply, Plaintiffs further argue that Defendants' alleged diligence was performative because it did not take into consideration the "off-book" liabilities that allegedly rendered DuPont

and Corteva insolvent. At this stage, based on the present record, the Court agrees with Plaintiffs. While most cases of fraudulent transfer typically do not involve the transparency, consultations, and protracted timing of the Vylor spin-off, this is not a typical case. Defendants are incredibly large, highly sophisticated companies facing an unprecedented amount of past and future liability. And while Chemours' lawsuit against DuPont and Corteva settled, the basis of the lawsuit lends credibility to Plaintiffs' claim that the Vylor spin-off is nothing more than a particularly sophisticated fraudulent transfer. Based on the timing of the spin-off, DuPont and Corteva's resultant insolvency, and the other numerous badges of fraud identified by Plaintiffs, taken together, the Court finds that Plaintiffs are very likely to succeed on the merits of their actual fraudulent transfer claim. The Court therefore turns to the next element of a preliminary injunction, irreparable harm with no adequate remedy at law.

**2. Irreparable Harm with no Adequate Remedy at Law**

"Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). A plaintiff seeking preliminary injunctive relief must show that irreparable injury "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). A mere "possibility" is not enough. *Id.* "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*; *see Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). Further, to show irreparable harm, Plaintiffs must show a "'likelihood of substantial and immediate irreparable injury.'" *L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). Speculative future injury is not enough. *Id.*

Plaintiffs argue that they have suffered and will suffer irreparable harm due to DuPont and Corteva's insolvency and any further transfers of assets (Filing No. 34 at 32–33), and that they will suffer irreparable harm if Vylor dissipates its assets through shareholder dividends, stock buybacks, asset sales, or other actions outside the ordinary course of its business, *id.* at 33–34. The dissipation of these assets, according to Plaintiffs, will render inaccessible billions of dollars that would otherwise be used to satisfy Defendants' PFAs liabilities, abate further contamination, remediate prior contamination, restore resources harmed by contamination, and compensate citizens for injuries and other harms related to PFAs. At oral argument, Plaintiffs' counsel specifically explained that their experts' $40.66 billion and $13.95 billion valuations for Defendants' business lines are based on projected cash flows for those companies, but a dissipation of Defendants' assets will in turn affect Defendants' valuations.

Plaintiffs also argue that Defendants have demonstrated a clear intent to dissipate assets imminently, as shown by statements made by Defendants' management during a September 15, 2026 investor call (Filing No. 32-1 ¶ 35; Hearing Ex. 3). During the call, Vylor management stated it anticipates initiating a $3 billion share buyback shortly after the spin-off, and Corteva/DuPont further indicated an intent to "return cash to shareholders via dividends and targeted stock buybacks." (Hearing Ex. 1).

Defendants respond that, as the District of South Carolina held in the AFFF MDL, "remedies at law will be available" to Plaintiffs, and nothing has changed since the South Carolina court's denial of California's motion for a TRO (Filing No. 48 at 24). Defendants further contend that Plaintiffs' experts' own valuations of Defendants' businesses (totaling roughly $54.61) is more than enough to satisfy Plaintiffs' estimated PFAs liabilities, so a remedy at law exists. Defendants lastly argue that Plaintiffs' evidence of likely, imminent irreparable harm is speculative in several

ways. For one, Corteva has issued dividends and repurchased shares throughout its existence, but despite this and despite Defendants having incurred and begun paying existing PFAs liabilities, their market value continues to grow (Filing No. 48 at 25). More generally, Defendants argue that dividends and buybacks are paid out of retained earnings, not a fixed pool of assets, so there is no evidence that future dividends or buybacks would dissipate Defendants' assets. *Id.* at 26–27. Defendants lastly argue that Plaintiffs' estimate of PFAs liabilities are speculative because none of their claims "has been reduced to a judgment." *Id.* at 27–28.

While this case presents a close call, the Court finds that Plaintiffs have met their burden of showing likely, imminent irreparable harm. For the reasons explained above, the record supports that DuPont and Corteva are now insolvent insofar as the fair value of their assets is less than the fair value of their debts. Plaintiffs have also shown that Defendants are planning and have publicly announced a substantial share buyback and intent to "return cash to shareholders via dividends and targeted stock buybacks" shortly after the October 1, 2026, Vylor spin-off. Indeed, in discussing the balance of harms and public interest, Defendants vigorously contend that the Court should not restrain them—even temporarily—from initiating these types of extraordinary dividends and buybacks, corroborating Plaintiffs' other evidence that Defendants' will likely initiate these types of dissipation activities imminently. Plaintiffs have also persuasively explained how a large dividend or buyback would not just reduce Defendants' retained earnings, but would dissipate their overall asset valuation, leaving Defendants unable to cover their PFAs liabilities. The fact that some of these liabilities have not been "reduced to a judgment" does not change the Court's conclusion; a substantial portion of Defendants' PFAs liabilities have arisen through out-of-court settlements.

Based on the record before this Court and arguments presented by Plaintiffs, the Court respectfully differs from the District of South Carolina's conclusion and finds that in this case, Plaintiffs have shown a likely irreparable harm with no adequate remedy at law.

**3. <u>Balance of Harms and Public Interest</u>**

The final two questions are whether the balance of harms weighs in favor of preliminary relief and whether the public will benefit from the proposed injunction. "When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc.*, 695 F.3d at 678 (citation modified). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

Plaintiffs argue that absent immediate injunctive relief, the assets they seek to claw back from Vylor will be forever placed out of reach, rendering their ultimate request for equitable relief futile, and meaning that they never receive the funds needed to clean up massive PFAs contamination and redress other PFAs-related injuries (Filing No. 34 at 32–36). The harm to Defendants, Plaintiffs argue, is comparatively small, since Plaintiffs' proposed TRO is not a complete asset freeze and would allow Defendants to continue engaging in their ordinary business operations. *Id.* As to the public interest, Plaintiffs contend that a TRO would serve the public

interest in enforcing laws on behalf of citizens, ensuring debtors pay creditors, protecting public health, and preventing public harms. *Id.* at 36–37.

Defendants' raise two overarching arguments regarding the balance of harms. First, they contend that the Plaintiffs' proposed TRO constitutes an "unprecedented" request to substitute the court's judgment for Defendants' business judgment and will completely "hamstring" Defendants' boards and management (Filing No. 48 at 35–36). However, Plaintiffs are not requesting a complete asset freeze or supplanting Defendants' business judgment. As Plaintiffs make clear in briefing and their proposed order, the requested TRO would permit Defendants to continue operating their businesses as ordinary, as they see fit. The TRO would only temporarily enjoin a select group of actions *outside* the ordinary course of their businesses.

Defendants' second argument is that enjoining those actions, like dividends and buybacks, would "undermine" the benefits of those actions, "forcing the Companies to renege on promises to key stakeholders; sending market-wide warning signals; and potentially impeding the Companies' ability to access liquidity." (Filing No. 48 at 35). Defendants do not elaborate further on these potential harms. As for the public interest, Defendants argue that an "asset freeze" over Corteva would also "effectively enjoin[]"other entities with PFAs liabilities, like New DuPont and Chemours, though Defendants do not explain why or how non-parties would be bound by this Court's TRO. Defendants also argue that a TRO in this case would send a shockwave through the market and cause every company with potential PFAs liability to "tread on eggshells for fear that any plaintiff might displace the company's business strategy." (Filing No. 48 at 36).

Because Plaintiffs have shown a strong likelihood of success on the merits, they need only show that the balance of harms weigh slightly in their favor. The Court finds they have made this modest showing. The Court agrees with Plaintiffs that the loss of billions of dollars of fraudulently

transferred assets would substantially harm Plaintiffs, their environments, and their citizens, whereas the narrowly tailored TRO permits Defendants to continue operating their businesses as usual. The potential harms to Defendants' caused by an inability to issue dividends or buybacks are too generalized and speculative to weigh the balance of harms in Defendants' favor (Filing No. 49 ¶ 37 ("If Corteva were prevented from paying quarterly dividends and engaging in reasonable share repurchases, Corteva *may* not be able to realize these benefits and would suffer other concrete harms. . . . An inability to follow through on those expectations *could* undermine investor confidence . . . ." (emphases added))). The public interest is also served by the TRO for the reasons identified by Plaintiffs. Defendants' concerns about the narrow TRO in this case affecting the entire stock market and other litigation is entirely speculative.

### D. Bond

The parties dispute whether an injunction bond is required. Plaintiffs argue Defendants will not incur any damages from the proposed TRO because it will only preserve the status quo by preventing the dissipation of assets, while permitting Defendants to continue operating in the ordinary course of their businesses (Filing No. 34 at 37). Defendants respond that Plaintiffs should be required to post a bond, and that Plaintiffs' "conclusory assertion that [Defendants] would suffer no harm is contradicted by the record." (Filing No. 48 at 37).

But Defendants do not cite the portions of "the record" supporting their assertion, rather, they presumably refer to their earlier claim that the proposed TRO would leave Defendants "unable to respond to market changes" and "force [them] to renege on promises to key stakeholders." *Id.* at 35. Defendants propose that the bond "cover the value of the assets [Plaintiffs] demand to freeze," though they give no specific amount. *Id.* at 37.

The Court recognizes that "absent extraordinary circumstances," it should grant a bond request. *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980). Rule 65

creates an "implicit presumption" in favor of a bond. *Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill.*, 717 F.2d 385, 391 (7th Cir. 1983) (stating that waiver of the bond requirement is "a dispensation narrowly construed in this circuit"). "Normally an injunction bond or equivalent security is essential" because a party "injured by an erroneous preliminary injunction is entitled to be made whole." *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011). District courts have significant discretion in setting the amount of a bond, but the Seventh Circuit has directed courts to "err on the high side." *Auto Driveway Franchise Sys., LLC v. Auto Driveway Richmond, LLC*, 928 F.3d 670, 679 (7th Cir. 2019); *see Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010) ("[A]n error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.").

The Court finds that the extraordinary circumstances of this case warrant waiving the bond requirement. To start, the Plaintiffs in this litigation are not ordinary litigants—they are sixteen states and sovereigns—who will certainly remain in a position to compensate Defendants for any harm that a fourteen-day TRO might cause. A bond in this case would do nothing other than tie up an incredible amount of public funds.

This case is also extraordinary with respect to the value of the proposed bond and the dearth of evidence supporting that proposal. Defendants' perfunctory bond request does not specify a dollar amount, but its reference to the "value of the assets [Plaintiffs] demand to freeze" may include tens of billions of dollars (Filing No. 48 ta 37). As explained above, Defendants overstate both the scope and duration of the proposed TRO, and their vague, speculative references to potential "market changes" and "promises to key stakeholders" do not support their extraordinary request for a multi-billion-dollar bond. "The burden of establishing the bond amount rests with the

party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 911 (N.D. Ill. 2015); *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007). ("A district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number 'was within the range of options from which one could expect a reasonable trial judge to select.'" (quoting *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141–42 (7th Cir. 1994))). The Court is therefore left unable to make an educated guess, much less a reasoned decision, as to an appropriate bond amount.

Absent any evidence that Defendants will incur monetary damages from the TRO, and considering the extraordinary circumstances of this case, Plaintiffs need not post a bond. The parties are free to revisit this issue in more detail at the preliminary injunction stage.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order (Filing No. 27) is **GRANTED**.

IT IS, THEREFORE, **ORDERED** that:

1. A temporary restraining order is issued immediately.

2. Corteva, Inc., and EIDP, Inc.—along with their officers, directors, principals, agents, representatives, employees, affiliates, and any person or entity acting on their behalf, in concert with, or in participation with them—are hereby **restrained** from selling, transferring, encumbering, pledging, distributing, assigning, conveying, spinning off, or otherwise disposing of any assets outside of the ordinary course of Corteva's or EIDP's business operations absent a court order. For the avoidance of doubt, the issuance of dividends to shareholders and repurchasing of

company stock are not transactions that occur in the ordinary course of Corteva's or EIDP's business operations.

3. Vylor, Inc.—along with its officers, directors, principals, agents, representatives, employees, affiliates, and any person or entity acting on its behalf, in concert with, or in participation with it—is hereby **restrained** from selling, transferring, encumbering, pledging, distributing, assigning, conveying, spinning off, or otherwise disposing of any of the assets it received in connection with the Vylor Spinoff outside of the ordinary course of its business operations absent a court order. For the avoidance of doubt, the issuance of dividends to shareholders and repurchasing of company stock are not transactions that occur in the ordinary course of Vylor's business. The assets subject to this restraint include, without limitation, all stock, equity interests, and assets of Pioneer Hi-Bred International, Inc. and its subsidiaries.

4. This Order shall remain in full force and effect for a period of **fourteen (14) days** pursuant to Federal Rule of Civil Procedure 65.

5. No bond shall be required to be posted by Plaintiffs pursuant to Federal Rule of Civil Procedure 65(c).

6. Plaintiffs shall serve a copy of this Order upon each Defendant, by personal service, certified mail, or such other means as may effect actual notice, within **72 hours** of entry of this Order. This Order shall be binding upon each Defendant upon receipt of actual notice.

This matter **REMAINS SET** for a telephonic status conference with the Magistrate Judge on October 21, 2026 (Filing No. 51).

**SO ORDERED**.

Date: October 9, 2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Scott Leroy Barnhart
INDIANA ATTORNEY GENERAL
scott.barnhart@atg.in.gov

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
tbetz@taftlaw.com

Mark Bower
Office of the Maine Attorney General
mark.bower@maine.gov

Matthew Fitzgerald Chakmakian
Kelley Drye & Warren LLP
mchakmakian@kelleydrye.com

Betsy M. DeNardi
INDIANA ATTORNEY GENERAL
betsy.denardi@atg.in.gov

Levi Downing
Kelley Drye & Warren LLP
ldowning@kelleydrye.com

Wes Earnhardt
Cravath, Swaine & Moore LLP
wearnhardt@cravath.com

J. Wesley Earnhardt
Cravath, Swaine & Moore LLP
375 Ninth Avenue
New York, NY 10001

Joseph Gregory Eaton
BARNES & THORNBURG, LLP (Indianapolis)
joe.eaton@btlaw.com

Caitlyn Fields
Barnes & Thornburg LLP
caitlyn.fields@btlaw.com

Amanda Jane Gallagher
Barnes & Thornburg LLP

Amanda.Gallagher@btlaw.com

John Dalston Smith Gilmour
Kelley Drye & Warren, LLP
jgilmour@kelleydrye.com

William James Jackson
Kelley Drye & Warren LLP
bjackson@kelleydrye.com

Elizabeth Norris Krasnow
Kelley Drye & Warren LLP
ekrasnow@kelleydrye.com

Zoe Peer Makoul
Kelley Drye & Warren LLP
zmakoul@kelleydrye.com

Laura B. Murphy
Vermont Attorney General's Office
laura.murphy@vermont.gov

William E. Padgett
BARNES & THORNBURG, LLP (Indianapolis)
william.padgett@btlaw.com

Michael T. Reynolds
Cravath, Swaine & Moore LLP
mreynolds@cravath.com

Lana Rowenko
Kelley Drye & Warren, LLP
lrowenko@kelleydrye.com

Lauren Elizabeth Schadt
Kelley Drye & Warren LLP
laureneschadt@gmail.com

Joseph Mitchell Tanner
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mtanner@taftlaw.com

Daniel Mikhail Thompson
Barnes & Thornburg LLP

daniel.thompson@btlaw.com

Cory Christian Voight
INDIANA ATTORNEY GENERAL
cory.voight@atg.in.gov

David I. Zalman
Kelley Drye & Warren, LLP
dzalman@kelleydrye.com